# EDMONSON *v.* LEESVILLE CONCRETE CO., INC.

No. 89–7743.   Argued January 15, 1991—Decided June 3, 1991

KENNEDY, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, STEVENS, and SOUTER, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 631. SCALIA, J., filed a dissenting opinion, *post*, p. 644.

*James B. Doyle* argued the cause and filed a brief for petitioner.

*John S. Baker, Jr.,* argued the cause for respondent. With him on the brief was *John B. Honeycutt, Jr.**

JUSTICE KENNEDY delivered the opinion of the Court.

We must decide in the case before us whether a private litigant in a civil case may use peremptory challenges to exclude jurors on account of their race. Recognizing the impropriety of racial bias in the courtroom, we hold the race-based exclusion violates the equal protection rights of the challenged jurors. This civil case originated in a United States District Court, and we apply the equal protection component of the Fifth Amendment's Due Process Clause. See *Bolling* v. *Sharpe*, 347 U. S. 497 (1954).

I

Thaddeus Donald Edmonson, a construction worker, was injured in a jobsite accident at Fort Polk, Louisiana, a federal enclave. Edmonson sued Leesville Concrete Company for negligence in the United States District Court for the Western District of Louisiana, claiming that a Leesville employee permitted one of the company's trucks to roll backward and pin him against some construction equipment. Edmonson invoked his Seventh Amendment right to a trial by jury.

During *voir dire*, Leesville used two of its three peremptory challenges authorized by statute to remove black persons from the prospective jury. Citing our decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986), Edmonson, who is

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Steven R. Shapiro* and *John A. Powell;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers, Eric Schnapper, Samuel Rabinove, Deval L. Patrick, Marc Goodheart, Robert F. Mullen, David S. Tatel, Norman Redlich, Thomas J. Henderson,* and *Richard T. Seymour.*

Briefs of *amici curiae* urging affirmance were filed for Defense Research Institute by *Jeanmarie LoCoco* and *John J. Weigel;* for Dixie Insurance Co. by *Suzanne N. Saunders;* and for Louisiana Association of Defense Counsel by *Joseph R. Ward, Jr.,* and *Wood Brown III.*

himself black, requested that the District Court require Leesville to articulate a race-neutral explanation for striking the two jurors. The District Court denied the request on the ground that *Batson* does not apply in civil proceedings. As empaneled, the jury included 11 white persons and 1 black person. The jury rendered a verdict for Edmonson, assessing his total damages at $90,000. It also attributed 80% of the fault to Edmonson's contributory negligence, however, and awarded him the sum of $18,000.

Edmonson appealed, and a divided panel of the Court of Appeals for the Fifth Circuit reversed, holding that our opinion in *Batson* applies to a private attorney representing a private litigant and that peremptory challenges may not be used in a civil trial for the purpose of excluding jurors on the basis of race. 860 F. 2d 1308 (1989). The Court of Appeals panel held that private parties become state actors when they exercise peremptory challenges and that to limit *Batson* to criminal cases "would betray *Batson*'s fundamental principle [that] the state's use, toleration, and approval of peremptory challenges based on race violates the equal protection clause." *Id.*, at 1314. The panel remanded to the trial court to consider whether Edmonson had established a prima facie case of racial discrimination under *Batson*.

The full court then ordered rehearing en banc. A divided en banc panel affirmed the judgment of the District Court, holding that a private litigant in a civil case can exercise peremptory challenges without accountability for alleged racial classifications. 895 F. 2d 218 (1990). The court concluded that the use of peremptories by private litigants does not constitute state action and, as a result, does not implicate constitutional guarantees. The dissent reiterated the arguments of the vacated panel opinion. The Courts of Appeals have divided on the issue. See *Dunham* v. *Frank's Nursery & Crafts, Inc.*, 919 F. 2d 1281 (CA7 1990) (private litigant may not use peremptory challenges to exclude venirepersons on account of race); *Fludd* v. *Dykes*, 863 F. 2d

822 (CA11 1989) (same). Cf. *Dias* v. *Sky Chefs, Inc.*, 919 F. 2d 1370 (CA9 1990) (corporation may not raise a *Batson*-type objection in a civil trial); *United States* v. *De Gross*, 913 F. 2d 1417 (CA9 1990) (government may raise a *Batson*-type objection in a criminal case), rehearing en banc granted, 930 F. 2d 695 (1991); *Reynolds* v. *Little Rock*, 893 F. 2d 1004 (CA8 1990) (when government is involved in civil litigation, it may not use its peremptory challenges in a racially discriminatory manner). We granted certiorari, 498 U. S. 809 (1990), and now reverse the Court of Appeals.

## II

### A

In *Powers* v. *Ohio*, 499 U. S. 400 (1991), we held that a criminal defendant, regardless of his or her race, may object to a prosecutor's race-based exclusion of persons from the petit jury. Our conclusion rested on a two-part analysis. First, following our opinions in *Batson* and in *Carter* v. *Jury Commission of Greene County*, 396 U. S. 320 (1970), we made clear that a prosecutor's race-based peremptory challenge violates the equal protection rights of those excluded from jury service. 499 U. S., at 407–409. Second, we relied on well-established rules of third-party standing to hold that a defendant may raise the excluded jurors' equal protection rights. *Id.*, at 410–415.

*Powers* relied upon over a century of jurisprudence dedicated to the elimination of race prejudice within the jury selection process. See, *e. g., Batson, supra*, at 84; *Swain* v. *Alabama*, 380 U. S. 202, 203–204 (1965); *Carter, supra*, at 329–330; *Neal* v. *Delaware*, 103 U. S. 370, 386 (1881); *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). While these decisions were for the most part directed at discrimination by a prosecutor or other government officials in the context of criminal proceedings, we have not intimated that race discrimination is permissible in civil proceedings. See *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217, 220–221 (1946). In-

deed, discrimination on the basis of race in selecting a jury in a civil proceeding harms the excluded juror no less than discrimination in a criminal trial. See *id.*, at 220. In either case, race is the sole reason for denying the excluded venireperson the honor and privilege of participating in our system of justice.

That an act violates the Constitution when committed by a government official, however, does not answer the question whether the same act offends constitutional guarantees if committed by a private litigant or his attorney. The Constitution's protections of individual liberty and equal protection apply in general only to action by the government. *National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U. S. 179, 191 (1988). Racial discrimination, though invidious in all contexts, violates the Constitution only when it may be attributed to state action. *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 172 (1972). Thus, the legality of the exclusion at issue here turns on the extent to which a litigant in a civil case may be subject to the Constitution's restrictions.

The Constitution structures the National Government, confines its actions, and, in regard to certain individual liberties and other specified matters, confines the actions of the States. With a few exceptions, such as the provisions of the Thirteenth Amendment, constitutional guarantees of individual liberty and equal protection do not apply to the actions of private entities. *Tarkanian, supra*, at 191; *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 156 (1978). This fundamental limitation on the scope of constitutional guarantees "preserves an area of individual freedom by limiting the reach of federal law" and "avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 936–937 (1982). One great object of the Constitution is to permit citizens to structure their private relations as they choose subject only to the constraints of statutory or decisional law.

To implement these principles, courts must consider from time to time where the governmental sphere ends and the private sphere begins. Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints. This is the jurisprudence of state action, which explores the "essential dichotomy" between the private sphere and the public sphere, with all its attendant constitutional obligations. *Moose Lodge, supra,* at 172.

We begin our discussion within the framework for state-action analysis set forth in *Lugar, supra,* at 937. There we considered the state-action question in the context of a due process challenge to a State's procedure allowing private parties to obtain prejudgment attachments. We asked first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority, 457 U. S., at 939–941; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor, *id.,* at 941–942.

There can be no question that the first part of the *Lugar* inquiry is satisfied here. By their very nature, peremptory challenges have no significance outside a court of law. Their sole purpose is to permit litigants to assist the government in the selection of an impartial trier of fact. While we have recognized the value of peremptory challenges in this regard, particularly in the criminal context, see *Batson,* 476 U. S., at 98–99, there is no constitutional obligation to allow them. *Ross* v. *Oklahoma,* 487 U. S. 81, 88 (1988); *Stilson* v. *United States,* 250 U. S. 583, 586 (1919). Peremptory challenges are permitted only when the government, by statute or decisional law, deems it appropriate to allow parties to exclude a given number of persons who otherwise would satisfy the requirements for service on the petit jury.

Legislative authorizations, as well as limitations, for the use of peremptory challenges date as far back as the founding of the Republic; and the common-law origins of peremptories predate that. See *Holland* v. *Illinois*, 493 U. S. 474, 481 (1990); *Swain*, 380 U. S., at 212–217. Today in most jurisdictions, statutes or rules make a limited number of peremptory challenges available to parties in both civil and criminal proceedings. In the case before us, the challenges were exercised under a federal statute that provides, *inter alia:*

> "In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly." 28 U. S. C. § 1870.

Without this authorization, granted by an Act of Congress itself, Leesville would not have been able to engage in the alleged discriminatory acts.

Given that the statutory authorization for the challenges exercised in this case is clear, the remainder of our state-action analysis centers around the second part of the *Lugar* test, whether a private litigant in all fairness must be deemed a government actor in the use of peremptory challenges. Although we have recognized that this aspect of the analysis is often a factbound inquiry, see *Lugar, supra,* at 939, our cases disclose certain principles of general application. Our precedents establish that, in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits, see *Tulsa Professional Collection Services, Inc.* v. *Pope*, 485 U. S. 478 (1988); *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961); whether the actor is performing a traditional governmental function, see *Terry* v. *Adams*, 345 U. S. 461 (1953); *Marsh* v. *Alabama*, 326 U. S. 501 (1946); cf. *San Francisco Arts & Athletics, Inc.* v. *United States Olympic*

*Comm.*, 483 U. S. 522, 544–545 (1987); and whether the injury caused is aggravated in a unique way by the incidents of governmental authority, see *Shelley* v. *Kraemer*, 334 U. S. 1 (1948). Based on our application of these three principles to the circumstances here, we hold that the exercise of peremptory challenges by the defendant in the District Court was pursuant to a course of state action.

Although private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, *Tulsa Professional*, 485 U. S., at 485, our cases have found state action when private parties make extensive use of state procedures with "the overt, significant assistance of state officials." *Id.*, at 486; see *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922 (1982); *Sniadach* v. *Family Finance Corp. of Bay View*, 395 U. S. 337 (1969). It cannot be disputed that, without the overt, significant participation of the government, the peremptory challenge system, as well as the jury trial system of which it is a part, simply could not exist. As discussed above, peremptory challenges have no utility outside the jury system, a system which the government alone administers. In the federal system, Congress has established the qualifications for jury service, see 28 U. S. C. § 1865, and has outlined the procedures by which jurors are selected. To this end, each district court in the federal system must adopt a plan for locating and summoning to the court eligible prospective jurors. 28 U. S. C. § 1863; see, *e. g.*, Jury Plan for the United States District Court for the Western District of Louisiana (on file with Administrative Office of United States Courts). This plan, as with all other trial court procedures, must implement statutory policies of random juror selection from a fair cross section of the community, 28 U. S. C. § 1861, and nonexclusion on account of race, color, religion, sex, national origin, or economic status, 18 U. S. C. § 243; 28 U. S. C. § 1862. Statutes prescribe many of the details of the jury plan, 28 U. S. C. § 1863, defining the jury wheel, § 1863(b)(4), voter lists, §§ 1863(b)(2),

1869(c), and jury commissions, § 1863(b)(1). A statute also authorizes the establishment of procedures for assignment to grand and petit juries, § 1863(b)(8), and for lawful excuse from jury service, §§ 1863(b)(5), (6).

At the outset of the selection process, prospective jurors must complete jury qualification forms as prescribed by the Administrative Office of the United States Courts. See 28 U. S. C. § 1864. Failure to do so may result in fines and imprisonment, as might a willful misrepresentation of a material fact in answering a question on the form. *Ibid.* In a typical case, counsel receive these forms and rely on them when exercising their peremptory strikes. See G. Bermant, Jury Selection Procedures in United States District Courts 7–8 (Federal Judicial Center 1982). The clerk of the United States district court, a federal official, summons potential jurors from their employment or other pursuits. They are required to travel to a United States courthouse, where they must report to juror lounges, assembly rooms, and courtrooms at the direction of the court and its officers. Whether or not they are selected for a jury panel, summoned jurors receive a per diem fixed by statute for their service. 28 U. S. C. § 1871.

The trial judge exercises substantial control over *voir dire* in the federal system. See Fed. Rule Civ. Proc. 47. The judge determines the range of information that may be discovered about a prospective juror, and so affects the exercise of both challenges for cause and peremptory challenges. In some cases, judges may even conduct the entire *voir dire* by themselves, a common practice in the District Court where the instant case was tried. See Louisiana Rules of Court, Local Rule 13.02 (WD La. 1990). The judge oversees the exclusion of jurors for cause, in this way determining which jurors remain eligible for the exercise of peremptory strikes. In cases involving multiple parties, the trial judge decides how peremptory challenges shall be allocated among them. 28 U. S. C. § 1870. When a lawyer exercises a peremptory

challenge, the judge advises the juror he or she has been excused.

As we have outlined here, a private party could not exercise its peremptory challenges absent the overt, significant assistance of the court. The government summons jurors, constrains their freedom of movement, and subjects them to public scrutiny and examination. The party who exercises a challenge invokes the formal authority of the court, which must discharge the prospective juror, thus effecting the "final and practical denial" of the excluded individual's opportunity to serve on the petit jury. *Virginia* v. *Rives*, 100 U. S. 313, 322 (1880). Without the direct and indispensable participation of the judge, who beyond all question is a state actor, the peremptory challenge system would serve no purpose. By enforcing a discriminatory peremptory challenge, the court "has not only made itself a party to the [biased act], but has elected to place its power, property and prestige behind the [alleged] discrimination." *Burton* v. *Wilmington Parking Authority*, 365 U. S., at 725. In so doing, the government has "create[d] the legal framework governing the [challenged] conduct," *National Collegiate Athletic Assn.*, 488 U. S., at 192, and in a significant way has involved itself with invidious discrimination.

In determining Leesville's state-actor status, we next consider whether the action in question involves the performance of a traditional function of the government. A traditional function of government is evident here. The peremptory challenge is used in selecting an entity that is a quintessential governmental body, having no attributes of a private actor. The jury exercises the power of the court and of the government that confers the court's jurisdiction. As we noted in *Powers*, the jury system performs the critical governmental functions of guarding the rights of litigants and "ensur[ing] continued acceptance of the laws by all of the people." 499 U. S., at 407. In the federal system, the Constitution itself commits the trial of facts in a civil cause to the

jury. Should either party to a cause invoke its Seventh Amendment right, the jury becomes the principal factfinder, charged with weighing the evidence, judging the credibility of witnesses, and reaching a verdict. The jury's factual determinations as a general rule are final. *Basham* v. *Pennsylvania R. Co.*, 372 U. S. 699 (1963). In some civil cases, as we noted earlier this Term, the jury can weigh the gravity of a wrong and determine the degree of the government's interest in punishing and deterring willful misconduct. See *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1 (1991). A judgment based upon a civil verdict may be preclusive of issues in a later case, even where some of the parties differ. See *Allen* v. *McCurry*, 449 U. S. 90 (1980). And in all jurisdictions a true verdict will be incorporated in a judgment enforceable by the court. These are traditional functions of government, not of a select, private group beyond the reach of the Constitution.

If a government confers on a private body the power to choose the government's employees or officials, the private body will be bound by the constitutional mandate of race neutrality. Cf. *Tarkanian*, 488 U. S., at 192–193; *Rendell-Baker* v. *Kohn*, 457 U. S. 830 (1982). At least a plurality of the Court recognized this principle in *Terry* v. *Adams*, 345 U. S. 461 (1953). There we found state action in a scheme in which a private organization known as the Jaybird Democratic Association conducted whites-only elections to select candidates to run in the Democratic primary elections in Ford Bend County, Texas. The Jaybird candidate was certain to win the Democratic primary and the Democratic candidate was certain to win the general election. Justice Clark's concurring opinion drew from *Smith* v. *Allwright*, 321 U. S. 649, 664 (1944), the principle that "any 'part of the machinery for choosing officials' becomes subject to the Constitution's constraints." *Terry, supra,* at 481. The concurring opinion concluded:

> "[W]hen a state structures its electoral apparatus in a form which devolves upon a political organization the uncontested choice of public officials, that organization itself, in whatever disguise, takes on those attributes of government which draw the Constitution's safeguards into play." 345 U. S., at 484.

The principle that the selection of state officials, other than through election by all qualified voters, may constitute state action applies with even greater force in the context of jury selection through the use of peremptory challenges. Though the motive of a peremptory challenge may be to protect a private interest, the objective of jury selection proceedings is to determine representation on a governmental body. Were it not for peremptory challenges, there would be no question that the entire process of determining who will serve on the jury constitutes state action. The fact that the government delegates some portion of this power to private litigants does not change the governmental character of the power exercised. The delegation of authority that in *Terry* occurred without the aid of legislation occurs here through explicit statutory authorization.

We find respondent's reliance on *Polk County* v. *Dodson*, 454 U. S. 312 (1981), unavailing. In that case, we held that a public defender is not a state actor in his general representation of a criminal defendant, even though he may be in his performance of other official duties. See *id.*, at 325; *Branti* v. *Finkel*, 445 U. S. 507, 519 (1980). While recognizing the employment relation between the public defender and the government, we noted that the relation is otherwise adversarial in nature. 454 U. S., at 323, n. 13. "[A] defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior. Held to the same standards of competence and integrity as a private lawyer, . . . a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client." *Id.*, at 321.

In the ordinary context of civil litigation in which the government is not a party, an adversarial relation does not exist between the government and a private litigant. In the jury selection process, the government and private litigants work for the same end. Just as a government employee was deemed a private actor because of his purpose and functions in *Dodson,* so here a private entity becomes a government actor for the limited purpose of using peremptories during jury selection. The selection of jurors represents a unique governmental function delegated to private litigants by the government and attributable to the government for purposes of invoking constitutional protections against discrimination by reason of race.

Our decision in *West* v. *Atkins,* 487 U. S. 42 (1988), provides a further illustration. We held there that a private physician who contracted with a state prison to attend to the inmates' medical needs was a state actor. He was not on a regular state payroll, but we held his "function[s] within the state system, not the precise terms of his employment, [determined] whether his actions can fairly be attributed to the State." *Id.,* at 55–56. We noted:

> "Under state law, the only medical care West could receive for his injury was that provided by the State. If Doctor Atkins misused his power by demonstrating deliberate indifference to West's serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care." *Id.,* at 55.

In the case before us, the parties do not act pursuant to any contractual relation with the government. Here, as in most civil cases, the initial decision whether to sue at all, the selection of counsel, and any number of ensuing tactical choices in the course of discovery and trial may be without the requisite governmental character to be deemed state

action. That cannot be said of the exercise of peremptory challenges, however; when private litigants participate in the selection of jurors, they serve an important function within the government and act with its substantial assistance. If peremptory challenges based on race were permitted, persons could be required by summons to be put at risk of open and public discrimination as a condition of their participation in the justice system. The injury to excluded jurors would be the direct result of governmental delegation and participation.

Finally, we note that the injury caused by the discrimination is made more severe because the government permits it to occur within the courthouse itself. Few places are a more real expression of the constitutional authority of the government than a courtroom, where the law itself unfolds. Within the courtroom, the government invokes its laws to determine the rights of those who stand before it. In full view of the public, litigants press their cases, witnesses give testimony, juries render verdicts, and judges act with the utmost care to ensure that justice is done.

Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality. *Rose* v. *Mitchell*, 443 U. S. 545, 556 (1979); *Smith* v. *Texas*, 311 U. S. 128, 130 (1940). In the many times we have addressed the problem of racial bias in our system of justice, we have not "questioned the premise that racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts." *Powers*, 499 U. S., at 402. To permit racial exclusion in this official forum compounds the racial insult inherent in judging a citizen by the color of his or her skin.

## B

Having held that in a civil trial exclusion on account of race violates a prospective juror's equal protection rights, we con-

sider whether an opposing litigant may raise the excluded person's rights on his or her behalf. As we noted in *Powers:* "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Id.*, at 410. We also noted, however, that this fundamental restriction on judicial authority admits of "certain, limited exceptions," *ibid.*, and that a litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he or she has suffered a concrete, redressable injury, that he or she has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests. All three of these requirements for third-party standing were held satisfied in the criminal context, and they are satisfied in the civil context as well.

Our conclusion in *Powers* that persons excluded from jury service will be unable to protect their own rights applies with equal force in a civil trial. While individual jurors subjected to peremptory racial exclusion have the right to bring suit on their own behalf, "[t]he barriers to a suit by an excluded juror are daunting." *Id.*, at 414. We have no reason to believe these barriers would be any less imposing simply because a person was excluded from jury service in a civil proceeding. Likewise, we find the relation between the excluded venireperson and the litigant challenging the exclusion to be just as close in the civil context as in a criminal trial. Whether in a civil or criminal proceeding, "*[v]oir dire* permits a party to establish a relation, if not a bond of trust, with the jurors," a relation that "continues throughout the entire trial." *Id.*, at 413. Exclusion of a juror on the basis of race severs that relation in an invidious way.

We believe the only issue that warrants further consideration in this case is whether a civil litigant can demonstrate a sufficient interest in challenging the exclusion of jurors on account of race. In *Powers*, we held:

"The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable

injury, and the defendant has a concrete interest in challenging the practice. See *Allen* v. *Hardy*, 478 U. S. [255,] 259 [(1986)] (recognizing a defendant's interest in 'neutral jury selection procedures'). This is not because the individual jurors dismissed by the prosecution may have been predisposed to favor the defendant; if that were true, the jurors might have been excused for cause. Rather, it is because racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' *Rose* v. *Mitchell*, [*supra*, at 556], and places the fairness of a criminal proceeding in doubt." *Id.*, at 411.

The harms we recognized in *Powers* are not limited to the criminal sphere. A civil proceeding often implicates significant rights and interests. Civil juries, no less than their criminal counterparts, must follow the law and act as impartial factfinders. And, as we have observed, their verdicts, no less than those of their criminal counterparts, become binding judgments of the court. Racial discrimination has no place in the courtroom, whether the proceeding is civil or criminal. See *Thiel* v. *Southern Pacific Co.*, 328 U. S., at 220. Congress has so mandated by prohibiting various discriminatory acts in the context of both civil and criminal trials. See 18 U. S. C. § 243; 28 U. S. C. §§ 1861, 1862. The Constitution demands nothing less. We conclude that courts must entertain a challenge to a private litigant's racially discriminatory use of peremptory challenges in a civil trial.

It may be true that the role of litigants in determining the jury's composition provides one reason for wide acceptance of the jury system and of its verdicts. But if race stereotypes are the price for acceptance of a jury panel as fair, the price is too high to meet the standard of the Constitution. Other means exist for litigants to satisfy themselves of a jury's impartiality without using skin color as a test. If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes

retards that progress and causes continued hurt and injury. By the dispassionate analysis which is its special distinction, the law dispels fears and preconceptions respecting racial attitudes. The quiet rationality of the courtroom makes it an appropriate place to confront race-based fears or hostility by means other than the use of offensive stereotypes. Whether the race generality employed by litigants to challenge a potential juror derives from open hostility or from some hidden and unarticulated fear, neither motive entitles the litigant to cause injury to the excused juror. And if a litigant believes that the prospective juror harbors the same biases or instincts, the issue can be explored in a rational way that consists with respect for the dignity of persons, without the use of classifications based on ancestry or skin color.

## III

It remains to consider whether a prima facie case of racial discrimination has been established in the case before us, requiring Leesville to offer race-neutral explanations for its peremptory challenges. In *Batson*, we held that determining whether a prima facie case has been established requires consideration of all relevant circumstances, including whether there has been a pattern of strikes against members of a particular race. 476 U. S., at 96–97. The same approach applies in the civil context, and we leave it to the trial courts in the first instance to develop evidentiary rules for implementing our decision.

The judgment is reversed, and the case is remanded for further proceedings consistent with our opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The Court concludes that the action of a private attorney exercising a peremptory challenge is attributable to the government and therefore may compose a constitutional viola-

tion. This conclusion is based on little more than that the challenge occurs in the course of a trial. Not everything that happens in a courtroom is state action. A trial, particularly a civil trial is by design largely a stage on which private parties may act; it is a forum through which they can resolve their disputes in a peaceful and ordered manner. The government erects the platform; it does not thereby become responsible for all that occurs upon it. As much as we would like to eliminate completely from the courtroom the specter of racial discrimination, the Constitution does not sweep that broadly. Because I believe that a peremptory strike by a private litigant is fundamentally a matter of private choice and not state action, I dissent.

I

In order to establish a constitutional violation, Edmonson must first demonstrate that Leesville's use of a peremptory challenge can fairly be attributed to the government. Unfortunately, our cases deciding when private action might be deemed that of the state have not been a model of consistency. Perhaps this is because the state action determination is so closely tied to the "framework of the peculiar facts or circumstances present." See *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 726 (1961). Whatever the reason, and despite the confusion, a coherent principle has emerged. We have stated the rule in various ways, but at base, "constitutional standards are invoked only when it can be said that the [government] is *responsible* for the specific conduct of which the plaintiff complains." *Blum* v. *Yaretsky*, 457 U. S. 991, 1004 (1982). Constitutional "liability attaches only to those wrongdoers 'who carry a badge of authority of [the government] and represent it in some capacity.'" *National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U. S. 179, 191 (1988), quoting *Monroe* v. *Pape*, 365 U. S. 167, 172 (1961).

The Court concludes that this standard is met in the present case. It rests this conclusion primarily on two empirical assertions. First, that private parties use peremptory challenges with the "overt, significant participation of the government." *Ante*, at 622. Second, that the use of a peremptory challenge by a private party "involves the performance of a traditional function of the government." *Ante*, at 624. Neither of these assertions is correct.

## A

The Court begins with a perfectly accurate definition of the peremptory challenge. Peremptory challenges "allow parties to exclude a given number of persons who otherwise would satisfy the requirements for service on the petit jury." *Ante*, at 620. This description is worth more careful analysis, for it belies the Court's later conclusions about the peremptory.

The peremptory challenge "allow[s] parties," in this case *private* parties, to exclude potential jurors. It is the nature of a peremptory that its exercise is left wholly within the discretion of the litigant. The purpose of this longstanding practice is to establish for each party an "'arbitrary and capricious species of challenge'" whereby the "'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another'" may be acted upon. *Lewis* v. *United States*, 146 U. S. 370, 376 (1892), quoting 4 W. Blackstone, Commentaries *353. By allowing the litigant to strike jurors for even the most subtle of discerned biases, the peremptory challenge fosters both the perception and reality of an impartial jury. *Ibid.; Hayes* v. *Missouri*, 120 U. S. 68, 70 (1887); *Swain* v. *Alabama*, 380 U. S. 202, 219 (1965); *Holland* v. *Illinois*, 493 U. S. 474, 481–482 (1990). In both criminal and civil trials, the peremptory challenge is a mechanism for the exercise of *private* choice in the pursuit of fairness. The peremptory is, by de-

sign, an enclave of private action in a government-managed proceeding.

The Court amasses much ostensible evidence of the Federal Government's "overt, significant assistance" in the peremptory process. See *ante*, at 624. Most of this evidence is irrelevant to the issue at hand. The bulk of the practices the Court describes—the establishment of qualifications for jury service, the location and summoning of prospective jurors, the jury wheel, the voter lists, the jury qualification forms, the per diem for jury service—are independent of the statutory entitlement to peremptory strikes, or of their use. All of this government action is in furtherance of the Government's distinct obligation to provide a qualified jury; the Government would do these things even if there were no peremptory challenges. All of this activity, as well as the trial judge's control over *voir dire*, see *ante*, at 623–624, is merely a prerequisite to the use of a peremptory challenge; it does not constitute participation *in* the challenge. That these actions may be necessary to a peremptory challenge—in the sense that there could be no such challenge without a venire from which to select—no more makes the challenge state action than the building of roads and provision of public transportation makes state action of riding on a bus.

The entirety of the government's actual participation in the peremptory process boils down to a single fact: "When a lawyer exercises a peremptory challenge, the judge advises the juror he or she has been excused." *Ibid.* This is not significant participation. The judge's action in "advising" a juror that he or she has been excused is state action to be sure. It is, however, if not *de minimis*, far from what our cases have required in order to hold the government "responsible" for private action or to find that private actors "represent" the government. See *Blum, supra*, at 1004; *Tarkanian, supra*, at 191. The government "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant en-

couragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum, supra,* at 1004.

As an initial matter, the judge does not "encourage" the use of a peremptory challenge at all. The decision to strike a juror is entirely up to the litigant, and the reasons for doing so are of no consequence to the judge. It is the attorney who strikes. The judge does little more than acquiesce in this decision by excusing the juror. In point of fact, the government has virtually no role in the use of peremptory challenges. Indeed, there are jurisdictions in which, with the consent of the parties, *voir dire* and jury selection may take place in the absence of any court personnel. See *Haith* v. *United States,* 231 F. Supp. 495 (ED Pa. 1964), aff'd, 342 F. 2d 158 (CA3 1965) *(per curiam); State* v. *Eberhardt,* 32 Ohio Misc. 39, 282 N. E. 2d 62 (1972).

The alleged state action here is a far cry from that which the Court found, for example, in *Shelley* v. *Kraemer,* 334 U. S. 1 (1948). In that case, state courts were called upon to enforce racially restrictive covenants against sellers of real property who did not wish to discriminate. The coercive power of the State was necessary in order to enforce the private choice of those who had created the covenants: "[B]ut for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint." *Id.,* at 19. Moreover, the courts in *Shelley* were asked to enforce a facially discriminatory contract. In contrast, peremptory challenges are "exercised without a reason stated [and] without inquiry." *Swain, supra,* at 220. A judge does not "significantly encourage" discrimination by the mere act of excusing a juror in response to an unexplained request.

There is another important distinction between *Shelley* and this case. The state courts in *Shelley* used coercive force to impose conformance on parties who did not wish to discriminate. "Enforcement" of peremptory challenges, on

the other hand, does not compel anyone to discriminate; the discrimination is wholly a matter of private choice. See Goldwasser, Limiting a Criminal Defendant's Use of Peremptory Challenges: On Symmetry and the Jury in a Criminal Trial, 102 Harv. L. Rev. 808, 819 (1989). Judicial acquiescence does not convert private choice into that of the State. See *Blum*, 457 U. S., at 1004–1005.

Nor is this the kind of significant involvement found in *Tulsa Professional Collection Services, Inc.* v. *Pope*, 485 U. S. 478 (1988). There, we concluded that the actions of the executrix of an estate in providing notice to creditors that they might file claims could fairly be attributed to the State. The State's involvement in the notice process, we said, was "pervasive and substantial." *Id.*, at 487. In particular, a state statute directed the executrix to publish notice. In addition, the District Court in that case had "reinforced the statutory command with an order expressly requiring [the executrix] to 'immediately give notice to creditors.'" *Ibid.* Notice was not only encouraged by the State, but positively required. There is no comparable state involvement here. No one is compelled by government action to use a peremptory challenge, let alone to use it in a racially discriminatory way.

The Court relies also on *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961). See *ante*, at 621, 624. But the decision in that case depended on the perceived symbiotic relationship between a restaurant and the state parking authority from whom it leased space in a public building. The State had "so far insinuated itself into a position of interdependence with" the restaurant that it had to be "recognized as a joint participant in the challenged activity." *Burton, supra*, at 725. Among the "peculiar facts [and] circumstances" leading to that conclusion was that the State stood to profit from the restaurant's discrimination. 365 U. S., at 726, 724. As I have shown, the government's involvement in the use of peremptory challenges falls far short of "interde-

pendence" or "joint participation." Whatever the continuing vitality of *Burton* beyond its facts, see *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 358 (1974), it does not support the Court's conclusion here.

*Jackson* is a more appropriate analogy to this case. Metropolitan Edison terminated Jackson's electrical service under authority granted it by the State, pursuant to a procedure approved by the state utility commission. Nonetheless, we held that Jackson could not challenge the termination procedure on due process grounds. The termination was not state action because the State had done nothing to encourage the particular termination practice:

> "Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.' . . . *Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment.*" *Id.*, at 357 (emphasis added; footnote omitted).

The similarity to this case is obvious. The Court's "overt, significant" government participation amounts to the fact that the government provides the mechanism whereby a litigant can choose to exercise a peremptory challenge. That the government allows this choice and that the judge approves it, does not turn this private decision into state action.

To the same effect is *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149 (1978). In that case, a warehouse company's proposed sale of goods entrusted to it for storage pursuant to the New York Uniform Commercial Code was not fairly attributable to the State. We held that "the State of New York is in no way responsible for Flagg Brothers' decision, a decision which the State in § 7–210 permits but does not compel, to threaten to sell these respondents' belongings." *Id.*, at 165.

Similarly, in the absence of compulsion, or at least encouragement, from the government in the use of peremptory challenges, the government is not responsible.

"The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." *Swain*, 380 U. S., at 220. The government neither encourages nor approves such challenges. Accordingly, there is no "overt, significant participation" by the government.

## B

The Court errs also when it concludes that the exercise of a peremptory challenge is a traditional government function. In its definition of the peremptory challenge, the Court asserts, correctly, that jurors struck via peremptories "otherwise . . . satisfy the requirements for service on the petit jury." *Ante*, at 620. Whatever reason a private litigant may have for using a peremptory challenge, it is not the government's reason. The government otherwise establishes its requirements for jury service, leaving to the private litigant the unfettered discretion to use the strike for any reason. This is not part of the government's function in establishing the requirements for jury service. "'Peremptory challenges are exercised by a party, not in selection of jurors, but in rejection. It is not aimed at disqualification, but is exercised upon qualified jurors as matter of favor to the challenger.'" C. Lincoln, Abbott's Civil Jury Trials 92 (3d ed. 1912), quoting *O'Neil* v. *Lake Superior Iron Co.*, 67 Mich. 560, 561, 35 N. W. 162, 163 (1887). For this reason, the Court is incorrect, and inconsistent with its own definition of the peremptory challenge, when it says that "[i]n the jury selection process [in a civil trial], the government and private litigants work for the same end." See *ante*, at 627. The Court is also incorrect when it says that a litigant exercising a peremptory challenge is performing "a traditional function of the government." See *ante*, at 624.

The peremptory challenge is a practice of ancient origin, part of our common law heritage in criminal trials. See *Swain, supra,* at 212–218 (tracing history); *Holland,* 493 U. S., at 481 (same). Congress imported this tradition into federal civil trials in 1872. See ch. 333, 17 Stat. 282; *Swain,* 380 U. S., at 215, n. 14. The practice of unrestrained private choice in the selection of civil juries is even older than that, however. While there were no peremptory challenges in civil trials at common law, the struck jury system allowed each side in both criminal and civil trials to strike alternately, and without explanation, a fixed number of jurors. See *id.,* at 217–218, and n. 21, citing J. Proffatt, Trial by Jury § 72 (1877), and F. Busch, Law and Tactics in Jury Trials § 62 (1949). Peremptory challenges are not a traditional government function; the "tradition" is one of unguided private choice. The Court may be correct that "[w]ere it not for peremptory challenges, . . . the entire process of determining who will serve on the jury [would] constitut[e] state action." *Ante,* at 626. But there are peremptory challenges, and always have been. The peremptory challenge forms no part of the *government's* responsibility in selecting a jury.

A peremptory challenge by a private litigant does not meet the Court's standard; it is not a traditional government function. Beyond this, the Court has misstated the law. The Court cites *Terry* v. *Adams,* 345 U. S. 461 (1953), and *Marsh* v. *Alabama,* 326 U. S. 501 (1946), for the proposition that state action may be imputed to one who carries out a "traditional governmental function." *Ante,* at 621. In those cases, the Court held that private control over certain core government activities rendered the private action attributable to the State. In *Terry,* the activity was a private primary election that effectively determined the outcome of county general elections. In *Marsh,* a company that owned a town had attempted to prohibit on its sidewalks certain protected speech.

In *Flagg Bros., supra,* the Court reviewed these and other cases that found state action in the exercise of certain public functions by private parties. See 436 U. S., at 157–160, reviewing *Terry, Marsh, Smith* v. *Allwright,* 321 U. S. 649 (1944), and *Nixon* v. *Condon,* 286 U. S. 73 (1932). We explained that the government functions in these cases had one thing in common: exclusivity. The public-function doctrine requires that the private actor exercise "a power 'traditionally exclusively reserved to the State.'" 436 U. S., at 157, quoting *Jackson,* 419 U. S., at 352. In order to constitute state action under this doctrine, private conduct must not only comprise something that the government traditionally does, but something that *only* the government traditionally does. Even if one could fairly characterize the use of a peremptory strike as the performance of the traditional government function of jury selection, it has never been exclusively the function of the government to select juries; peremptory strikes are older than the Republic.

*West* v. *Atkins,* 487 U. S. 42 (1988), is not to the contrary. The Court seeks to derive from that case a rule that one who "serve[s] an important function within the government," even if not a government employee, is thereby a state actor. See *ante,* at 628. Even if this were the law, it would not help the Court's position. The exercise of a peremptory challenge is not an important government function; it is not a government function at all. In any event, *West* does not stand for such a broad proposition. The doctor in that case was under contract with the State to provide services for the State. More important, the State hired the doctor in order to fulfill the State's constitutional obligation to attend to the necessary medical care of prison inmates. 487 U. S., at 53, n. 10, 57. The doctor's relation to the State, and the State's responsibility, went beyond mere performance of an important job.

The present case is closer to *Jackson, supra,* and *Rendell-Baker* v. *Kohn,* 457 U. S. 830 (1982), than to *Terry, Marsh,*

or *West*. In the former cases, the alleged state activities were those of state-regulated private actors performing what might be considered traditional public functions. See *Jackson* (electrical utility); *Rendell-Baker* (school). In each case, the Court held that the performance of such a function, even if state regulated or state funded, was not state action unless the function had been one exclusively the prerogative of the State, or the State had provided such significant encouragement to the challenged action that the State could be held responsible for it. See *Jackson*, 419 U. S., at 352–353, 357; *Rendell-Baker, supra*, at 842, 840. The use of a peremptory challenge by a private litigant meets neither criterion.

## C

None of this should be news, as this case is fairly well controlled by *Polk County* v. *Dodson*, 454 U. S. 312 (1981). We there held that a public defender, employed by the State, does not act under color of state law when representing a defendant in a criminal trial.* In such a circumstance, government employment is not sufficient to create state action. More important for present purposes, neither is the performance of a lawyer's duties in a courtroom. This is because a lawyer, when representing a private client, cannot at the same time represent the government.

Trials in this country are adversarial proceedings. Attorneys for private litigants do not act on behalf of the government, or even the public as a whole; attorneys represent their clients. An attorney's job is to "advanc[e] the 'undivided interests of his client.' " This is essentially a private function . . . for which state office and authority are not

---

*Dodson* was a case brought under Rev. Stat. § 1979, 42 U. S. C. § 1983, the statutory mechanism for many constitutional claims. The issue in that case, therefore, was whether the public defender had acted "under color of state law." 454 U. S., at 314. In *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 929 (1982), the Court held that the statutory requirement of action "under color of state law" is identical to the "state action" requirement for other constitutional claims.

needed." *Id.*, at 318–319 (footnotes omitted). When performing adversarial functions during trial, an attorney for a private litigant acts independently of the government:

> "[I]t is the function of the public defender to enter not guilty' pleas, move to suppress State's evidence, object to evidence at trial, cross-examine State's witnesses, and make closing arguments in behalf of defendants. All of these are adversarial functions. We find it peculiarly difficult to detect any color of state law in such activities." *Id.*, at 320 (footnote omitted).

Our conclusion in *Dodson* was that "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Id.*, at 325. It cannot be gainsaid that a peremptory strike is a traditional adversarial act; parties use these strikes to further their own perceived interests, not as an aid to the government's process of jury selection. The Court does not challenge the rule of *Dodson*, yet concludes that private attorneys performing this adversarial function are state actors. Where is the distinction?

The Court wishes to limit the scope of *Dodson* to the actions of public defenders in an adversarial relationship with the government. *Ante*, at 626–627. At a minimum then, the Court must concede that *Dodson* stands for the proposition that a criminal defense attorney is not a state actor when using peremptory strikes on behalf of a client, nor is an attorney representing a private litigant in a civil suit against the government. Both of these propositions are true, but the Court's distinction between this case and *Dodson* turns state action doctrine on its head. Attorneys in an adversarial relation to the state are not state actors, but that does not mean that attorneys who are not in such a relation *are* state actors.

The Court is plainly wrong when it asserts that "[i]n the jury selection process, the government and private litigants work for the same end." See *ante*, at 627. In a civil trial,

the attorneys for each side are in "an adversarial relation," *ibid.;* they use their peremptory strikes in direct opposition to one another, and for precisely contrary ends. The government cannot "work for the same end" as both parties. In fact, the government is neutral as to private litigants' use of peremptory strikes. That's the point. The government does not encourage or approve these strikes, or direct that they be used in any particular way, or even that they be used at all. The government is simply not "responsible" for the use of peremptory strikes by private litigants.

Constitutional "liability attaches only to those wrongdoers 'who carry a badge of authority of [the government] and represent it in some capacity.'" *Tarkanian,* 488 U. S., at 191. A government attorney who uses a peremptory challenge on behalf of the client is, by definition, representing the government. The challenge thereby becomes state action. It is antithetical to the nature of our adversarial process, however, to say that a private attorney acting on behalf of a private client represents the government for constitutional purposes.

## II

Beyond "significant participation" and "traditional function," the Court's final argument is that the exercise of a peremptory challenge by a private litigant is state action because it takes place in a courtroom. *Ante,* at 628. In the end, this is all the Court is left with; peremptories do not involve the "overt, significant participation of the government," nor do they constitute a "traditional function of the government." The Court is also wrong in its ultimate claim. If *Dodson* stands for anything, it is that the actions of a lawyer in a courtroom do not become those of the government by virtue of their location. This is true even if those actions are based on race.

Racism is a terrible thing. It is irrational, destructive, and mean. Arbitrary discrimination based on race is particularly abhorrent when manifest in a courtroom, a forum

established by the government for the resolution of disputes through "quiet rationality." See *ante*, at 631. But not every opprobrious and inequitable act is a constitutional violation. The Fifth Amendment's Due Process Clause prohibits only actions for which the Government can be held responsible. The Government is not responsible for everything that occurs in a courtroom. The Government is not responsible for a peremptory challenge by a private litigant. I respectfully dissent.

JUSTICE SCALIA, dissenting.

I join JUSTICE O'CONNOR's dissent, which demonstrates that today's opinion is wrong in principle. I write to observe that it is also unfortunate in its consequences.

The concrete benefits of the Court's newly discovered constitutional rule are problematic. It will not necessarily be a net help rather than hindrance to minority litigants in obtaining racially diverse juries. In criminal cases, *Batson* v. *Kentucky*, 476 U. S. 79 (1986), already prevents the *prosecution* from using race-based strikes. The effect of today's decision (which logically must apply to criminal prosecutions) will be to prevent the *defendant* from doing so—so that the minority defendant can no longer seek to prevent an all-white jury, or to seat as many jurors of his own race as possible. To be sure, it is ordinarily more difficult to *prove* race-based strikes of white jurors, but defense counsel can generally be relied upon to do what we say the Constitution requires. So in criminal cases, today's decision represents a net loss to the minority litigant. In civil cases that is probably not true—but it does not represent an unqualified gain either. *Both* sides have peremptory challenges, and they are sometimes used to *assure* rather than to *prevent* a racially diverse jury.

The concrete costs of today's decision, on the other hand, are not at all doubtful; and they are enormous. We have now added to the duties of already-submerged state and federal trial courts the obligation to assure that race is not included among the other factors (sex, age, religion, political

views, economic status) used by private parties in exercising their peremptory challenges. That responsibility would be burden enough if it were not to be discharged through the adversary process; but of course it is. When combined with our decision this Term in *Powers* v. *Ohio*, 499 U. S. 400 (1991), which held that the party objecting to an allegedly race-based peremptory challenge need not be of the same race as the challenged juror, today's decision means that *both* sides, in *all* civil jury cases, no matter what their race (and indeed, even if they are artificial entities such as corporations), may lodge racial-challenge objections and, after those objections have been considered and denied, appeal the denials—with the consequence, if they are successful, of having the judgments against them overturned. Thus, yet another complexity is added to an increasingly Byzantine system of justice that devotes more and more of its energy to sideshows and less and less to the merits of the case. Judging by the number of *Batson* claims that have made their way even as far as this Court under the *pre-Powers* regime, it is a certainty that the amount of judges' and lawyers' time devoted to implementing today's newly discovered Law of the Land will be enormous. That time will be diverted from other matters, and the overall system of justice will certainly suffer. Alternatively, of course, the States and Congress may simply abolish peremptory challenges, which would cause justice to suffer in a different fashion. See *Holland* v. *Illinois*, 493 U. S. 474, 484 (1990).

Although today's decision neither follows the law nor produces desirable concrete results, it certainly has great symbolic value. To overhaul the doctrine of state action in this fashion—what a magnificent demonstration of this institution's uncompromising hostility to race-based judgments, even by private actors! The price of the demonstration is, alas, high, and much of it will be paid by the minority litigants who use our courts. I dissent.