**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOSEPHINE P. MOURNING,
Plaintiff-Appellant,

v.

BROWN LINCOLN-MERCURY,
INCORPORATED; GORDON S. RIDDLE,           No. 96-1171
Defendants-Appellees,

and

HAL MILLER,
Defendant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-95-795-A)

Argued: June 2, 1997

Decided: October 10, 1997

Before HALL and NIEMEYER, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Dale Warren Dover, Alexandria, Virginia, for Appellant.
Richard Van Wert Adams, III, WALTON & ADAMS, P.C., McLean,

Virginia, for Appellees. **ON BRIEF:** Jeffrey A. Huber, WALTON & ADAMS, P.C., McLean, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Josephine P. Mourning appeals the judgment of the district court, entered in conformance with the jury's verdict, denying her any recovery on her civil rights claims against Brown Lincoln-Mercury, Inc., and its General Manager, Gordon S. Riddle. We affirm.

I.

During the evening of June 15, 1993, Mourning telephoned Brown Lincoln-Mercury in Fairfax, Virginia, in response to the latter's advertisement in the Washington Post. She spoke with Fernand Elbeze, a salesman at the dealership, about purchasing a used Lincoln Town Car, preferably burgundy in color. Elbeze told Mourning that there was a burgundy 1989 Town Car on the lot that had been driven a little less than 40,000 miles. According to Mourning, Elbeze quoted her a price of $14,999 for the car.

The next day, Mourning, who is black, made the 40-mile trek from her home in Landover, Maryland, to see the car, accompanied by her fiance and his young son. She was greeted by Bernie Brown (no relation to the owner), who informed her that Elbeze had the day off. Brown had been showing Mourning the car for about ten minutes when a senior salesman, Hal Miller, arrived on the scene and took over. Miller later said that he replaced Brown, who had only about a month's experience selling cars, because Mourning was becoming agitated that the sticker on the burgundy Town Car reflected a price

2

that was $1,000-$2,000 in excess of the one that Elbeze had allegedly quoted.

During the course of the next four or five hours, Mourning repeatedly asked Miller for a test-drive of the burgundy Town Car. Miller repeatedly put her off, trying instead to persuade her to purchase a black 1989 Town Car that had 2,000-3,000 more miles on it, but that was about $5,000 less expensive. According to Miller, he attempted to discourage Mourning's interest in the burgundy car because she had firmly expressed her desire to keep her monthly payments below $300; though Mourning was willing to make a $5000 down payment, her monthly obligation on the burgundy car would still have been $70-80 more than her stated maximum. Moreover, upon obtaining a copy of Mourning's credit report, Miller surmised that Ford Credit would not approve her application if the proposed payments exceeded $300 per month.

Miller left Mourning several times to assist other customers, all of whom happened to be white. Mourning finally demanded to talk with Riddle. Riddle, however, merely offered to take Mourning's address and send her $15 for her time and expense.

Perhaps not surprisingly, Mourning left without buying anything; although there seemed little prospect that she would ever return, Miller, pursuant to the dealership's unwritten "policy," submitted Mourning's credit application to Ford Credit. Mourning was later notified by mail that her application had been rejected by two lenders, including Ford Credit.

Less than two weeks later, Mourning purchased a burgundy 1992 Town Car from a competing dealership, Dave Pyles Lincoln-Mercury, for approximately $22,500. The staff at Pyles submitted Mourning's credit application to Ford Credit, just as Miller had, but this time the application was approved.

Why the different result? One possible explanation is that Mourning reported her total monthly income on the Pyles application as $4,700; on the Brown application, her income was listed as $4,200 per month. The Pyles transaction also involved a newer car with a

3

loan term of 60 months, as opposed to the 36-month loan that was the maximum available for the older vehicle at Brown.

Mourning, however, has a different theory. Both applications to Ford Credit contained a space for prospective purchasers under age 27 (Mourning would not have qualified) to provide their educational background. The completed Brown application depicted Mourning as having received a bachelor of science degree in accounting from Howard University, a traditionally black institution, in 1978. Mourning, who never went to college, testified that she did not place this false information on the Brown application; she maintains that the dealership instead made the notation as a signal to Ford Credit that the applicant was a black person.

Mourning filed a complaint with the Virginia Human Rights Council, which, upon investigating the matter, determined that no reasonable cause existed to believe that she had been discriminated against. On June 15, 1995, Mourning filed suit in the district court against the dealership, Riddle, and Miller, alleging that she been deprived of her rights to make and enforce contracts and to purchase personal property on the same footing as white citizens, in violation of 42 U.S.C. §§ 1981-82. She also alleged that the defendants had violated certain provisions of the Virginia Consumer Protection Act, VA. CODE ANN. § 59.1-196 et seq. (Michie 1992).

Trial before a jury commenced on January 2, 1996. During his opening statement, Mourning's lawyer asserted, without going into specifics, that the Brown application had been "black-coded" to identify his client's race -- an allegation that had not previously been made in the complaint or explored during discovery. On the witness stand, Mourning produced what she represented to be a copy of the credit application that she had filled out at Pyles, obtained from that dealership's files. The request for educational information on that application, in contrast to the one submitted by Brown, had been left blank.

At the close of Mourning's case-in-chief, the district court granted judgment as a matter of law to Riddle on all claims, and to the dealership on the state-law claims. As Miller had not been timely served with the summons and complaint (he had moved to another state), the

4

claims against him were dismissed without prejudice. <u>See</u> Fed. R. Civ. P. 4(m).**1**

The first witness for the defense was Robert Sherwood, the finance director at Pyles, appearing at trial pursuant to a subpoena <u>duces tecum</u>. Sherwood produced what he purported to be a copy of the application filled out by Mourning at Pyles, which he represented had been obtained from the company's files. The request for educational background on Sherwood's copy of the Pyles application, had, like the Brown application, been filled out to list Mourning as having obtained a four-year degree from Howard in accounting.**2**

The jury ultimately rendered its verdict for Brown, upon which the district court entered judgment. Mourning appeals.

II.

A.

"Forfeited" errors -- that is, those irregularities occurring at trial to which no contemporaneous objection is lodged-- will, at least in the context of civil proceedings, be noticed by federal appellate courts in only the most singular of circumstances. Recently, in <u>Owens-Illinois, Inc. v. Rapid American Corp.</u>, No. 96-1592, 1997 WL 539667, at \*10 (4th Cir. Sept. 4, 1997), we made it clear that we will not exercise our discretion to correct such errors unless, at a minimum, the prerequisites of <u>United States v. Olano</u>, 507 U.S. 725 (1993), are fulfilled. In other words, the appellant must show that the trial was infected with (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. <u>Olano</u>, 507 U.S. at 732.

_____

**1** Though Miller did not appear at trial, his deposition was read into the record during the defense's case-in-chief.

**2** Neither party conclusively established the identity of the person or persons who had completed the educational information portion of either the Brown application or the copy of the Pyles application produced by Sherwood.

5

With the above principle in mind, we observe that virtually the entirety of Mourning's appeal involves rulings of the district court to which she failed to object. For instance, Mourning contends that defense counsel used one of its peremptory challenges to strike the lone black venireperson on account of her race, in violation of Edmonson v. Leesville Concrete Co., 500 U.S. 614, 616 (1991), which extended to civil proceedings the rule of Batson v. Kentucky, 476 U.S. 79 (1986). At the moment of the strike, the district court, sua sponte, requested that the defense explain its action. Counsel responded that he was uncomfortable with the woman as a juror because, among other things, she had been trained as a paralegal. The district court accepted counsel's explanation as revealing a race-neutral motive for the strike. More importantly, by failing to object to the court's ruling or asking that the matter be investigated further, Mourning also implicitly accepted the explanation.

Later on, as Mourning was testifying during her case-in-chief, Riddle left the courtroom several times.[3] At the conclusion of Mourning's testimony, the district court admonished the defense to have Riddle remain seated at counsel's table. Though Mourning now boldly speculates that Riddle left to contact Pyles so that the application later introduced through Sherwood could be fabricated, she did not timely advise the district court of her suspicions so that they could be verified or disproved. Instead, Mourning acquiesced in the court's verbal admonition, and she did not revisit the matter once Sherwood had testified.

Mourning's passivity at trial resulted in the utter lack of a record on which the merits of her arguments may now be evaluated. There can be no remedy for a "plain" error, of course, unless it is first demonstrated that an error actually occurred. Absent sufficient indication of an irregularity, the Olano analysis ends at its threshold.

B.

As important as the need to make an objection is the need to make

_____

**3** Riddle had been designated as Brown's representative and was permitted to be present during all trial proceedings. See Fed. R. Evid. 615.

6

the <u>right</u> objection, particularly where an adverse evidentiary ruling is concerned. Fed. R. Evid. 103(a) provides:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

Moreover, "an objection on specific grounds does not preserve the error for purposes of appeal on other grounds." <u>Judd v. Rodman</u>, 105 F.3d 1339, 1342 (11th Cir. 1997).

When the defense moved Sherwood's copy of the Pyles application into evidence, Mourning's lawyer objected on the ground that it had not been properly authenticated. This objection was overruled by the district court -- properly so, in light of the direct examination that had taken place moments before:

> [COUNSEL]:   Are you the custodian of records at Dave Pyles?
>
> [SHERWOOD]:  I have access to them.
>
> Q: Are they within your control?
>
> A: Yes.
>
> . . . .
>
> Q: Do you have with you the records for the Josephine Mourning transaction?
>
> A: Yes. . . .
>
> [A bench conference ensues]
>
> Q: You now have in front of you a document that's been marked as Defendant's Exhibit 12. Correct?

7

. . . .

A: Yes.

Q: What is that document?

A: It's a credit application or customer statement.

Q: From whom?

. . . .

A: From Josephine P. Mourning.

. . . .

Q: Exhibit No. 12 is, in fact, a Ford Motor Credit application, isn't it?

A: Yes.

Evidence is authenticated whenever the record is"sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). Most often, the authentication requirement will be met by testimony from a witness, like Sherwood, "that a matter is what it is claimed to be." Rule 901(b)(1).[4]

Mourning now maintains, however, that Sherwood's copy of the Pyles application should have been excluded because it was not the

_____

[4] That Sherwood did not participate in the creation of the Pyles application is of no moment. The requirements of Rule 901 are fulfilled by the testimony of the custodian of business records that a particular document is included within them. From such testimony, the finder of fact may reasonably conclude that the document in question "is what its proponent claims," i.e., a record maintained by the custodian's employer. The custodian's inability to vouch for the veracity of the information contained within his employer's records relates only to the evidentiary weight to be accorded the particular document, and not to its admissibility. In other words, it is a subject appropriately explored on cross-examination.

"best evidence," i.e., the original document. See Fed. R. Evid. 1002 ("To prove the content of a writing, recording, or photograph, the original . . . is required, except as otherwise provided by these rules or by Act of Congress"). Because this ground for objection was not specified below, we consider it only to assure ourselves that the district court's admission of the evidence did not constitute plain error.

In this case, assurance comes easily. The purpose of Rule 1002 is not to erect a formalistic barrier to the admission of relevant evidence, but to help ensure that a writing, recording, or photograph admitted into evidence accurately depicts what it purports to depict. As long as that purpose is adequately served by a duplicate of the original, then the rules permit admission of the duplicate. Fed. R. Evid. 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

Sherwood's copy of the Pyles application, with the educational information filled in, was admitted for the purpose of rebutting Mourning's allegation -- supported by her own,"clean" version of the same document -- that the Brown application had been "black-coded" by virtue of its reference to Howard University. Both documents were alleged to be the same thing, i.e. , a copy of the original application that Mourning actually completed at Pyles, yet the copies themselves were not identical. The most logical explanation for the discrepancy was that either Sherwood or Mourning had testified falsely.[5]

Inasmuch as the entire case essentially boiled down to a credibility contest between Mourning and Sherwood, there was nothing unfair about admitting the latter's copy of the Pyles application once the former's had been accepted into evidence. There was no genuine reason to believe that the copy produced by Mourning was inherently more authentic than that produced by Sherwood, who was, after all, disin-

_____

[5] There is no merit, therefore, to Mourning's contention that the application introduced through Sherwood should have been excluded as violative of the district court's scheduling order that all exhibits be disclosed prior to trial. The order expressly permitted the introduction of undisclosed exhibits for the purposes of impeachment or rebuttal.

terested in the litigation. As neither of the concerns expressed in Rule 1003 were present in this case, it would have been inappropriate for the district court to exclude Sherwood's copy of the application merely on the ground that it was not the original.

III.

Not surprisingly, the jury was perplexed by the incompatible copies of the Pyles application. It sent three notes to the district court concerning the matter, the last of which stated that"[t]he jury feels that it is paramount that it understands without question, whether or not the Plaintiff's exhibit 4 is claimed to be a copy of the Defendant's exhibit 12." The district court had earlier admonished the jury to rely on its own recollection of the evidence, but it relented in response to the final note, stating:

> Neither party has claimed that one is a copy of the other. Ms. Mourning testified that she picked up Ex. 4 from Dave Pyles. Mr. Sherman, credit mgr. of Dave Pyles, testified that Ex. 12 was in the file kept by Dave Pyles on the Mourning transaction.

The district court's answer was correct in every material respect, though it did slightly misstate Sherwood's name and his job title (he was the finance manager, not the credit manager).

Mourning nevertheless complains that the district court should not have answered the jury's inquiries at all, and that the answer actually given was misleading. Typically, there appears no indication in the record that Mourning objected to the court's action so that any perceived error could have been addressed and corrected, if necessary.

It is obvious to us that the jury was in a genuine quandary, and that the district court did precisely what was required to permit a just verdict to be reached. We discern no plain error in the court's measured response to the jury's repeated requests for clarification. See Section II-A, supra (detailing the process governing plain-error analysis).

IV.

The judgment below is affirmed.

AFFIRMED

10