611 So.2d 880 (1992)
Mary Ann DEDEAUX, Tomika Marie Dedeaux and Kelvic Lewade Dedeaux
v.
J.I. CASE COMPANY, INC. and Lee Tractor Company of Mississippi, Inc.
No. 89-CA-1323.
Supreme Court of Mississippi.
December 17, 1992.
*881 James K. Wetzel, Gulfport, for appellant.
W. Lee Watt, Raymond L. Brown, Brown & Watt, Pascagoula, for appellee.
En Banc.
ROY NOBLE LEE, Chief Justice, for the Court:
Mary Ann Dedeaux, Tomika Marie Dedeaux and Kelvic Lewade Dedeaux (hereinafter Dedeaux), beneficiaries of Charles E. Dedeaux, the deceased, filed a wrongful death action against J.I. Case Company, Inc., and Lee Tractor Company of Mississippi, Inc. (both hereinafter Case) based on theories of strict liability, negligent design, failure to warn and general negligence. After a four (4) day trial beginning September 11, 1989, the jury returned a verdict in favor of the defendants and a judgment in accordance with the jury verdict was entered on September 14, 1989.
*882 Dedeaux filed a motion for JNOV or, in the alternative, for a new trial. The lower court denied the motion, and Dedeaux has appealed to this Court and presents the following issues for decision:
I. THE APPELLANTS WERE DENIED THEIR CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL TRIAL BY THE LOWER COURT BY ALLOWING THE APPELLEES TO EXERCISE ALL OF THEIR PEREMPTORY CHALLENGES AGAINST FOUR BLACK JURORS, THEREBY DENYING THE APPELLANTS THEIR CONSTITUTIONAL GUARANTEE OF EQUAL PROTECTION UNDER THE LAW AS PROVIDED BY THE CONSTITUTION OF THE UNITED STATES AND THE STATE OF MISSISSIPPI.
II. THE LOWER COURT ERRED IN FINDING THAT APPELLEES' EXPERT, RICHARD G. MURRAY, WAS COMPETENT TO TESTIFY AS TO THE DESIGN OF THE PRODUCT IN QUESTION, AS WELL AS TO TESTIFY AS TO THE FIELD OF ACCIDENT RECONSTRUCTION.
III. THE LOWER COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN ALLOWING THE APPELLEES' EXPERT WITNESSES, AS WELL AS LAY WITNESSES, TO TESTIFY AS TO MANUFACTURERS IN THE CONSTRUCTION AND INDUSTRIAL EQUIPMENT INDUSTRY NOT USING PROTECTIVE ENCLOSURES FOR OPERATORS.
IV. THE LOWER COURT ERRED AS A MATTER OF LAW IN GRANTING JURY INSTRUCTION NO. D-20 WHICH ALLOWED THE JURY TO FIND NEGLIGENCE ON BEHALF OF THE APPELLANTS WITHOUT GIVING ANY GUIDE AS TO WHAT ACTS OR OMISSIONS ARE SUFFICIENT TO CONSTITUTE NEGLIGENCE.
The appellees filed a cross-appeal assigning the following error:
V. THE LOWER COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY OF THE OPEN AND OBVIOUS NATURE OF THE ALLEGED DANGER.

FACTS
On March 23, 1984, Charles E. Dedeaux, the deceased, was employed as a member of a work team for the City of Pass Christian Public Works Department. The team, which included Charles, Thomas Ladner, John Banes, Frances Saucier, and Joe Payne, was engaged in clearing small abandoned craft from the Pass Christian Harbor.[1] Charles was operating a 1981 Case Model 580 Super D backhoe manufactured by J.I. Case Company, Inc., and sold by Lee Tractor Company of Mississippi, Inc., the appellees (hereinafter Case). Charles and other members of the Pass Christian Public Works Department connected a nylon rope tow line and grappling hook to the backhoe in order to retrieve four (4) small crafts from the Pass Christian Harbor. The half-inch nylon rope was tied to the base of the backhoe between the tires.
In attempting to retrieve a fifth submerged craft, the grappling hook was again used to tow the skiff instead of tying the rope to the bow eye of the skiff. The rope broke and it was tied in a knot and then hooked on to the skiff again. Charles resumed towing the skiff. Bane testified that the rope had a tight strain on it and that the skiff was digging into the sand beach. Bane directed Cox to tell Charles to stop, he instructed everybody to get out of the way and they started "scattering." At that point, one of the tines on the hook straightened and the hook came loose. In its recoil, the hook struck Charles Dedeaux, who was in the operator's position, in the head causing serious injuries which resulted in his death approximately one (1) hour later.
Dedeaux brought a wrongful death action to recover damages for the loss of society and companionship of Charles, for loss of future earnings, for pain and suffering endured by Charles and for medical and *883 burial expenses. Dedeaux also requested an award of punitive damages. According to Dedeaux, Case was negligent in not equipping the backhoe with a screen or some type of protective enclosure to prevent objects from penetrating the operator's work space.
David Comstock, an employee of Lee Tractor at the time the backhoe was purchased, testified that the City of Pass Christian advertised for bids on a backhoe. The bid specifications called for a backhoe with a metal canopy or ROPS (rollover protection system) canopy, not a cab. Comstock also testified that he was familiar with the custom and practice in the industry regarding backhoes, and he stated that he had never seen a backhoe come with any type of protective screen. According to Comstock, a backhoe either has a metal canopy or an enclosed cab.
Dr. Richard G. Murray, an expert in the fields of engineering design, function of industrial equipment, and accident reconstruction, testified that to prevent the hook from penetrating the operator's work space, the enclosure would need to be bullet proof. According to Dr. Murray, the hook was probably traveling at approximately 500 miles per hour.
The jury returned a verdict in favor of Case. Dedeaux appealed the decision to this Court, and Case filed a cross-appeal.

LAW

I. DOES BATSON APPLY TO THIS CIVIL CASE?
Dedeaux contends that her Constitutional right to an impartial jury trial was denied. Case used its four (4) peremptory challenges to remove the only four (4) black members on the jury panels.
Dedeaux, who is black, objected and moved the lower court to strike the jury panel. A discussion was held as to whether Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), applied in civil cases. Although Case's counsel was of the opinion that Batson did not apply in civil cases, he stated his reasons for challenging the jurors. The lower court overruled Dedeaux's objection and accepted the all-white jury panel.
Subsequent to the trial and the briefing of this case, the United States Supreme Court resolved the issue of whether a private litigant in a civil case may use peremptory challenges to exclude jurors based solely on their race. In Edmonson v. Leesville Concrete Co., 500 U.S. ___, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the United States Supreme Court concluded that "courts must entertain a challenge to a private litigant's racially discriminatory use of peremptory challenges in a civil trial." Id. at ___, 111 S.Ct. at 2088, 114 L.Ed.2d at 680. As a result, the question before this Court is whether Case violated the principles established in Batson and Edmonson.
In order to establish a prima facie case of purposeful discrimination, one must show the following:
(1) that he is a member of a cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; (3) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.
Davis v. State, 551 So.2d 165, 170 (Miss. 1989), cert denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 797 (1990). See also Batson, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87-88. Once a prima facie case has been established, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. See also Davis, 551 So.2d at 170.
The reasons, however, do not have to "rise to the level justifying exercise of a challenge for cause." Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. A neutral explanation must be articulated which relates to the particular case being tried. Id. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88. "The trial court then will have the duty to determine if the defendant *884 has established purposeful discrimination." Id. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88-89.
In Chavous v. Brown, 299 S.C. 398, 385 S.E.2d 206 (S.C. Ct. App. 1989), aff'd, 305 S.C. 387, 409 S.E.2d 356 (1991), the Court of Appeals of South Carolina was faced with a similar case. The court held that Batson was not limited to criminal cases. Chavous, 385 S.E.2d at 209. In addressing the peremptory strikes, the court noted the following:
The respondents struck the two black males and the two black females. The appellants struck one white male and three white females. The seated jury consisted of eight white males and four white females.
The respondents provided the following explanation for their challenges:
[Two] of the strikes are of the female gender.... One of the strikes was unemployed and has never worked... . I was concerned about young jurors who would be more concerned about the scarring on a young fifteen or sixteen year old boy than would older jurors who have experienced more of life's bumps and falls and have seen scars as they developed... .
From this explanation, the black women were struck because of their gender combined with their unemployment or youth... .
... .
As to the black women, the explanation for striking them because of their possible reactions to facial scarring is not by itself a supportable racially neutral reason. The respondents chose not to exercise strikes against seven white women for the same reason. However, the respondents combined the gender concern with other factors. The factor as to one black woman was unemployment. Unemployment was deemed a racially neutral explanation by the South Carolina Supreme Court in State v. Martinez. See State v. Martinez, 294 S.C. 72, 362 S.E.2d 641. The announced reason for excluding the other black woman was her youth. The record indicates this woman was thirty years old. Of the seven white females on the jury panel two were younger than this juror and one was thirty-two. Coincidentally, of the nine white males of the jury three were younger than the black female and one was thirty-one. We can only conclude that youth was not a concern of the respondents in the selection of white jurors. Thus, an originally neutral reason has been shown to be a pretext for exclusion based solely on race. State v. Oglesby, [298 S.C. 279] 379 S.E.2d 891.
Chavous, 385 S.E.2d at 209-11 (alteration in original) (emphasis added). See also, Garrett v. Morris, 815 F.2d 509 (8th Cir.), cert. denied, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987).
The appellee, Case, peremptorily challenged the four black jurors and the trial judge required Case to articulate racially neutral reasons. The first black juror challenged by Case was Damian Nicholson. During voir dire, Nicholson informed the Court that he knew Mrs. Dedeaux and that they had worked at the same hospital for seven (7) years. Case's counsel challenged Nicholson on this basis and the court overruled Dedeaux's objection as to Nicholson. We hold that this was a sufficiently neutral reason for the challenge.
Case also challenged Veronica K. Nance. The juror stated that she was to be a witness in Chancery Court that week. Although the judge noted that he could work around her scheduled testimony, Case challenged her on the basis that she would be distracted from the proceedings at hand. Case also noted that she was only 23 years old and unemployed. We hold that this was a sufficiently neutral reason.
Case challenged Jeanette Hardy on the ground that she was employed as a maid and had no husband. Case further reasoned that the trial dealt with complicated designs, defects, warnings, and issues in the work place. Case was of the opinion that Hardy would not do a good job in handling the issues, even though she did have a high school education.
*885 Cathel Coleman was the fourth juror peremptorily challenged. She was unemployed, had no husband, and according to Case did not appear to have the background to consider the complicated issues involved.
In support of his challenge of the four jurors, Case's attorney made the following statement:
I believe in a products liability case, in fact, I believe in most of my cases as a defendant, that my defendant is better served with who I deem, through job or education or responses to questions or whatever we put into out [sic] minds to make judgments on, have the intellectual capacity to be the best 12 that I can put on my case... . I'm looking for people who will look at the facts and have the intellectual capacity to handle my issue.
Dedeaux contends that the race neutral reasons offered for striking black jurors are merely pretextual. Dedeaux contends that three (3) potential jurors that made the final panel were less qualified on the basis of education and job experience:
(1) Viola Johnson was a 66 year old housewife who only had a junior high education.
(2) Barbara Welch was a 66 year old unemployed female who only had a high school education.
(3) Sue White was a 52 year old housewife who only had a high school education.
The record reflects that Johnson had been employed part-time at Gayfers for an eight month period and that Welch had been a sales clerk at Gayfers. There was no indication that White had ever been employed. According to Case, people with jobs such as sales clerks were more qualified to sit as jurors than those with jobs such as maids or janitors, like Jeanette Hardy. Case's attorney said:
Had there been anybody on that jury with a job description that said janitor or maid as opposed to others who had job descriptions that indicated that they had been out in the business world dealing with people or as in the case of a couple of these sales clerks at Gayfers dealing with people, I would have seriously considered striking them and if I would have had enough challenges would have, your Honor.
Furthermore, with respect to Sue White, Case maintained that it exhausted all of its challenges before getting to her. Even so, Case argued that she was more qualified to sit on the jury than Hardy and Coleman because her husband worked at D.I. Dupont for 30 years.
In Lockett v. State, 517 So.2d 1346 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988), this Court held:
[A] trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence.
Id. at 1350.
In denying Dedeaux's post-trial motion, the trial judge held and stated:
[T]he Court noted no surprise or alarm to counsel for the Defendants when asked to respond to the Plaintiffs' Motion to Strike the Jury Panel. The Court also noted that counsel for the Defendants immediately responded to the Plaintiffs' motion when asked.
Edmonson was decided June 3, 1991. The case presently before this Court was tried and concluded for a four day period beginning September 11, 1989. Without the benefit of Edmonson, counsel for the appellees stated the neutral reasons to the court for exercising peremptory challenges on the four black jurors. The trial judge, who saw the action and the expressions of Case's attorney and observed him while he was giving those neutral reasons stated:
These observations, together with the reasons set forth by counsel for the Defendants, demonstrated to the Court that the defendants did not discriminatorily use their peremptory strikes.
On this record, we cannot say that the trial judge committed error in allowing the peremptory challenges to the four jurors.

*886 II.
The appellant, Dedeaux, contends that the lower court erred in finding that Richard G. Murray was competent to testify as an expert in the design of the backhoe and as to the field of accident reconstruction.
After the voir dire examination of Murray, the trial judge made the following ruling:
BY THE COURT: The Court has to rule on the admissibility of this person to testify and, of course, the jury decides the credibility. I will allow him to testify and you may proceed as an expert in those fields of design, function of industrial equipment, accident reconstruction.
BY MR. BROWN: And causation.
BY THE COURT: And causation, okay.
The admission of expert testimony is left to the sound discretion of the trial judge. Hickox By and Through Hickox v. Holleman, 502 So.2d 626, 637 (Miss. 1987). "We will not reverse on the question of determining the qualifications of an expert, absent a showing of abuse of discretion on the part of the trial judge." Billiot v. State, 454 So.2d 445, 459 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369 (1985).
In Hall v. Hilbun, 466 So.2d 856 (Miss. 1985), this Court held that "a witness qualified as an expert by knowledge, skill, experience, training or education (or a combination thereof), coupled with independence and lack of bias, may testify thereto in the form of an opinion or otherwise." Id. at 873-74 (footnote omitted) (emphasis added). Murray also testified that he had been accepted by state and federal courts to testify in all of the areas in question.
As to the issue of accident reconstruction and causation, Murray testified as follows:
Q: Dr. Murray, how would you describe the dynamics of an accident, an impact accident or accident involving machines, as distinct between an airplane or construction machinery or agricultural machinery?
A: Oh, generally speaking the dynamics and the behavior of the systems would be the same. I have done a lot of accident reconstruction and work on construction equipment. You haven't asked me that question.
Q: No, I haven't. You have done work?
A: Oh, yes. And oil rigs and boats and cars and structures and buildings.
Q: You did say construction equipment?
A: Yes, sir, industrial trucks, forklifts, cranes.
As to his qualifications, Murray testified that he had a Ph.D. in mechanical engineering. As a graduate assistant, he developed the hydrogen engine as a research project resulting in a U.S. patent. In 1970, Murray opened his own consulting business which primarily solves problems for industry or government. He also became department head of the Department of Mechanical (Power) Engineering Technology for Oklahoma State University. In his resume, Murray lists several publications that he authored and several engineering courses that he taught.
Dedeaux claims that Murray was biased. However, in Mississippi State Highway Commission v. Smith, 240 So.2d 704 (Miss. 1970), this Court held that the issue of bias of an expert witness was an issue for the jury to decide. Id. at 705. At trial, Murray testified that he did work for manufacturers and private individuals.
We find that the trial judge did not abuse his discretion in allowing Murray to testify as an expert in the field of mechanical engineering, design, function of industrial equipment and accident reconstruction and causation and the issue is rejected.

III.
Dedeaux contends that the lower court erred in permitting Case's expert witnesses, as well as lay witnesses, to testify as to manufacturers in the construction and industrial industry not using protective enclosures for operators. Only three (3) witnesses testified on behalf of Case: (1) David Comstock, a lay witness and former employee of Lee Tractor; (2) Max North, an expert witness and former employee of Case; and (3) Dr. Murray, an expert witness. They were asked if they were familiar *887 with the custom and practice in the industry relating to whether any manufacturers provided guards, shields, and enclosures on backhoes as standard equipment. Over objection, the trial judge permitted the witnesses to answer the question.
The "routine practice" of a business is relevant. M.R.E. 406. In Catholic Diocese of Natchez-Jackson v. Jaquith, 224 So.2d 216 (Miss. 1969), this Court stated:
Evidence of custom and usage in any event is not the ultimate test of negligence, but is admissible solely for the purpose of assisting the jury, along with other evidence, in determining whether the conduct of a party was that of a reasonably prudent man. See 65A C.J.S. Negligence § 232 (1966).
Jaquith, 224 So.2d at 222.
The issue is rejected.

IV.
Dedeaux contends that the lower court erred in granting jury instruction D-20 which allowed the jury to find negligence on behalf of the plaintiff without giving any guide as to what acts or omissions are sufficient to constitute negligence. Instruction D-20 was a contributory negligence instruction and provided that, if the jury found contributory negligence, the damages awarded should be reduced in proportion to the decedent's negligence.
"[A]n instruction charging negligence or contributory negligence must define those acts which would constitute such." Trainer v. Gibson, 360 So.2d 1226, 1228 (Miss. 1978). See also, Jones v. Craft, 218 So.2d 727, 729 (Miss. 1969); Rayborn v. Freeman, 209 So.2d 193, 196 (Miss. 1968); Gore v. Patrick, 246 Miss. 715, 723, 150 So.2d 169, 171 (1963).
Dedeaux's counsel gave no specific objection to the instruction, which was not sufficient to preserve the issue for appeal. Watson v. State, 483 So.2d 1326, 1329 (Miss. 1986). Furthermore, the verdict of the jury effectively stated that Case was not guilty of negligence which caused or contributed to the accident and death of the deceased. There was no award by the jury to be reduced.

V. CROSS-APPEAL
Case cross-appeals for failure of the lower court to instruct the jury of the open and obvious nature of the alleged danger. We are of the opinion that there is no merit in the cross-appeal and the case is affirmed on cross-appeal.
AFFIRMED ON DIRECT APPEAL. AFFIRMED ON CROSS-APPEAL.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, PITTMAN and ROBERTS, JJ., concur.
BANKS, J., dissents with separate written opinion joined by SULLIVAN and McRAE, JJ.
BANKS, Justice, dissenting:
I fear that today's decision contravenes the constitutional policy expressed by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and extended to civil litigants in Edmonson v. Leesville Concrete Co., Inc., 500 U.S. ___, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). For that reason, I dissent from part I of the majority opinion.
In Batson, the Supreme Court stated that purposeful racial discrimination in selection of the jury violates a defendant's right to equal protection, because it denies him the protection that a trial by jury is intended to secure. 476 U.S. at 86, 106 S.Ct. at 1717, 90 L.Ed.2d at 80. "The very idea of a jury is a body ... composed of the peers or equals of the person whose rights it is summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society which he holds." Id. (quoting Strauder v. West Virginia, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880)). Racial discrimination in the selection of jurors harms not only the person whose rights they are summoned to try. It also harms those individuals excluded from the jury on such a basis. Batson, 476 U.S. at 87, 106 S.Ct. at 1718, 90 L.Ed.2d at 81; Edmonson, 500 U.S. at ___, 111 S.Ct. at 2081, 114 L.Ed.2d at 672. Their *888 exclusion reflects an assessment that they are unqualified and/or incapable of impartially considering the evidence presented at trial.
As great as these individual injuries may be, the greatest harm of all may be that which is inflicted upon society as a whole. The judicial system is an institution which, in theory at least, is designed to reflect the ideals of justice and equality. The Court stands as our protector of rights. It shares a fiduciary relationship with each and every individual in this country. Therefore, the integrity of the Court demands that it be completely immune from cancers like racial discrimination. It cannot denounce racial discrimination on the one hand and be a party to its perpetration on the other hand. By allowing racially discriminatory jury selection procedures, the Court becomes just as much a party to the discrimination as the party who initiated those procedures. Edmonson, 500 U.S. at ___, ___, 111 S.Ct. at 2084-2085, 114 L.Ed.2d at 675-676.
If we allow individuals to be excluded from juries solely on the basis of their skin color, public confidence in this institution which is designed to promote fairness, justice, and equality will continue to be undermined. We send a message that there is no justice and some individuals are more equal than others. This is clearly very incompatible with the smooth functioning of our heterogeneous society. Therefore, if we are to fulfill our designed role in the functioning of this society, we must police proceedings in the courts with as much zeal as possible to eliminate all traces of racial discrimination. In doing so, we must reject explanations for suspect challenges which can be readily seen as pretextual.
This Court seemed to implicitly recognize this principle in Chisolm v. State of Mississippi, 529 So.2d 635, 639 (Miss. 1988), where we said, "We do not wish to send a message that any superficially non-race based reason will pass muster under Batson." (Emphasis supplied.) That is precisely the message the Court sends today, however. Mr. Dedeaux was a thirty-eight-year-old black man. There were four black persons on the venire for the trial of his wrongful death action. J.I. Case disqualified each of them using peremptory challenges.
Two of the four individuals struck by J.I. Case were Jeanette Hardy and Cathel Coleman. With respect to these two women, counsel for J.I. Case said, "Coleman and Hardy were the two that I struck because I thought their intellectual levels to grasp the issues in the case were lower than I wanted on the jury." He pointed out that Jeanette Hardy was employed as a maid and had no husband. For these reasons he said, "she would not do a good job with the complicated designs, defects, and warnings issues in the workplace", despite the fact that she had a high school education. Counsel for J.I. Case pointed out similar concerns about Cathel Coleman. He claimed that she was unemployed, had no husband, and did not appear to have the background to consider the complicated issues involved. Cathel Coleman, like Jeanette Hardy, had a high school education. In response to questioning by the Court regarding its challenges, the attorney for J.I. Case said that he was "looking for people who will look at the facts and have the intellectual capacity to handle [his] issue." He said he based that decision on the individual's job, education, responses given to questions posed to them, and any other criteria the lawyers put into their minds to make judgments on.
Looking at the credentials of the persons left to sit on this twelve-person jury, it is hard to believe that education was truly a determining criteria in making the decision to strike. Three members of the jury had education levels equal to or lower than Ms. Hardy's and Ms. Coleman's. Viola Johnson only had a junior high school education. Barbara Welch and Sue White had high school educations, like Jeanette Hardy and Cathel Coleman.
It is equally as hard to see a line of distinction based on "job". Counsel for J.I. Case said of this criterion, "I think one's employment is often reflective of intellect and capacity." He said he did not believe individuals employed as a maid, like Ms. Hardy, would have the intellectual level to understand the issues in the case. The fact *889 that Ms. Coleman was unemployed was alleged to be a blemish on her qualifications to serve on the jury. Based on this criterion, however, there were three women allowed to sit on the jury who were no more qualified than Hardy and Coleman, if not less qualified. They are the same three women mentioned above as possessing equal or lower educational levels than Hardy and Coleman  Viola Johnson, Barbara Welch, and Sue White. Mrs. Johnson was a sixty-six year-old housewife, whose only prior employment consisted of an eight-month stint at Gayfer's. Ms. Welch was sixty-six and unemployed. The only prior work experience on her part that appears in the record is sales work at Gayfer's. There is no indication as to how long she held that job. The record does not indicate that Mrs. White, who was fifty-two years old, had ever had a job.
Counsel for J.I. Case did not ask any questions of Coleman, Hardy, or any of the other persons on the venire aimed at discerning their level of intellect or ability to understand the issues involved in the case. Based on the criteria specified by counsel for J.I. Case, it is almost inconceivable that Coleman and Hardy could be ranked any lower on a scale of intellect than the aforementioned women. The only conceivable way that could happen is if the judging party employed a presumption that black persons are intellectually inferior to similarly-situated white persons.
This is precisely the kind of racial discrimination that the Batson Court intended to rid from our judicial system. A party may not in the exercise of his or her peremptory strikes assign a characteristic to an individual merely because of that person's race. 476 U.S. at 97-98, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Even if it could be said that counsel for J.I. Case did not act with such ill will as to employ a negative presumption about the intellect of black persons, it is evident that those criteria upon which black venire persons were eliminated were not applied with equal force to their white counterparts. Such differential treatment of individuals solely on the basis of race is in itself the textbook example of racial discrimination. Therefore, under either scenario, the reasons articulated by the J.I. Case lawyer are not race-neutral but instead pretexts for racial discrimination. Consequently, his actions must be declared unconstitutional under Batson and Edmonson. For these reasons, I dissent.
SULLIVAN and McRAE, JJ., join this dissent.
NOTES
[1] Leo Cox, the harbor master, was also present.