# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01459-SCT

*PAMELA VENTON AND MICHAEL VENTON,*
*INDIVIDUALLY AND ON BEHALF OF THE*
*WRONGFUL DEATH BENEFICIARIES OF*
*JONATHAN VENTON, DECEASED*

*v.*

*DR. JAMES R. BECKHAM*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/25/2001 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KIMBERLY GEORGETTE JONES |
| | CHARLES VICTOR McTEER |
| ATTORNEYS FOR APPELLEE: | CLINTON M. GUENTHER |
| | TOMMIE G. WILLIAMS |
| | WILLIE L. BAILEY |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 05/15/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.     This case concerns a medical malpractice claim for the death of an unborn child.  Pamela and

Michael Venton (Pamela, Michael, or "the Ventons" collectively) filed suit on May 4, 1998, in the Circuit

Court of Washington County, Mississippi, against Dr. James R. Beckham (Dr. Beckham) for the wrongful

death of their unborn child, Jonathan.  At the conclusion of the trial the jury returned a verdict in favor of

Dr. Beckham and judgment was entered accordingly.  The jury was comprised of seven African-

Americans, five caucasians and two African-American alternate jurors. Of the twelve jurors, seven were female and five were male. The trial court denied the Ventons' motion for judgment notwithstanding the verdict and in the alternative a motion for new trial. From this ruling, the Ventons now appeal to this Court. This Court finds that the Ventons arguments are without merit and affirms the judgment entered on the jury verdict in favor of Dr. Beckham.

## FACTS

¶2.     Dr. Beckham was Pamela's physician during her pregnancy. Unfortunately, Pamela's pregnancy terminated on June 4, 1997, with the death of her child. This suit arose over a dispute between the parties concerning Dr. Beckham's recommendation of the time of the baby's delivery.

¶3.     Pamela had a history of mild to heightened blood pressure from December 17, 1996, throughout her pregnancy. This condition may increase the risk of placental insufficiency which could result in fetal demise, i.e. death. Fetal monitoring was performed on the baby. A series of non-stress tests were administered to monitor the baby's heartbeat and well-being. The tests reveal two types of results. A "reactive" result signifies the baby's well-being, whereas a "non-reactive" result signifies that either the baby does not have well-being or the baby's well-being cannot be confirmed.

¶4.     Pamela had non-stress tests on May 23, May 25, and May 28, 1997. All these tests had reactive results. On June 2, 1997, Pamela returned for another non-stress test. The June 2 test had a non-reactive result. On June 3, 1997, Pamela had two more non-stress tests administered in the morning and in the afternoon. Both tests on June 3 had non-reactive results. Following the tests performed on June 3, a dispute arises between the parties concerning the recommended time for delivery.

¶5.     Dr. Beckham claims that after the two non-reactive tests on June 3, he urged Pamela to allow him to deliver the baby by cesarean section that afternoon. His medical report stated that he recommended

delivery "today" that being June 3. Dr. Beckham was concerned about the well being of the baby. Pamela, however, insisted on waiting until June 5, 1997, to deliver the baby initially then stated June 4. He stated that Pamela told him that "I've got too much to do and there's no way I can come in till Thursday" (June 5). Prior to the delivery on the morning of June 4, it was discovered that the baby had died sometime between the afternoon of June 3 and the morning of June 4. In contrast, Pamela claims that Dr. Beckham gave her an option to have the delivery performed on either June 3 or the morning of June 4, 1997.

¶6.     On appeal to this Court the Ventons raise the following issues:

**I.      Whether the trial court erred and abused its discretion by striking two African-American jurors for cause for a lack of transportation and striking two African-American jurors for cause for failure to disclose collection efforts by the clinic employing Dr. Beckham.**

**II.     Whether the trial court erred and abused its discretion for denying the Ventons' Motion to Compel Production of Documents**.

**III.    Whether the verdict was against the overwhelming weight of the evidence.**

**<u>LEGAL ANALYSIS</u>**

**I.      Whether the trial court erred and abused its discretion by striking two African-American jurors for cause for a lack of transportation and striking two African-American jurors for cause for failure to disclose collection efforts by the clinic employing Dr. Beckham.**

¶7.     "A circuit judge has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. The circuit judge has an absolute duty, however, to see that the jury selected to try any case is fair, impartial and competent." *Ill. Cent. R.R. v. Hawkins*, 830 So.2d 1162, 1176 (Miss. 2002). *See also Brown ex rel. Webb v. Blackwood*, 697 So.2d 763, 769 (Miss. 1997); *Poe v. State,* 739 So.2d 405, 409 (Miss. Ct. App. 1999)(the trial court has wide latitude in deciding whether to excuse a potential juror, including an exclusion for cause).

¶8. The trial judge has discretion in determining whether to excuse a juror, and such decision will not be set aside unless it is clearly wrong. *Wells v. State*, 698 So.2d 497, 501 (Miss. 1997). "Because the trial judge, due to his presence during the voir dire process, is in a better position to evaluate the prospective juror's responses, the decision of whether or not to excuse the juror is left to the trial judge's discretion." *Smith v. State*, 802 So.2d 82, 86 (Miss. 2001) (quoting *Wells v. State*, 698 So.2d 497, 501 (Miss.1997)).

¶9. The Ventons argue that the trial court abused its discretion by striking for cause two jurors with transportation problems. The two jurors were African-American females, Carol Eanes (Eanes) and Diane Washington (Washington). Additionally, the Ventons argue that the trial court abused its discretion by striking for cause Shirley Grigsby (Grigsby) and Evelyn Williams (Williams). These two jurors, also African-American females, were struck because they had been patients at Dr. Beckham's clinic and failed to disclose that their accounts had been in collection. The Ventons argue that the exclusion of these four venire persons was irrational and on the basis of race, sex, and economic condition.

## A. Transportation

¶10. During voir dire, the trial judge became aware that venire persons Washington and Eanes had transportation difficulties. The following pertinent exchanges occurred:

> Q. Thank you. Ms. Allison, did you say that you had transportation problems?
> A. Yes.
> Q. Difficulty in getting acknowledge [sic] and forth to court?
> A. Yes.
> Q. You understand that this case might last - - will probably last for three days and end up sometime Wednesday?
> A. Yes.
> Q. And on your own you simply don't have a way to get back and forth?
> A. No, sir. I ride to work with another guy.
> Q. Mr. Ledbetter - oh, what's your name, ma'am?
> A. (Carol Eanes) Carol Eanes.

4

Q.     Ms. Eanes?
A.     Yes, sir. (Inaudible)
       **THE COURT**: Can't hear her.
A.     Carol Eanes.
Q.     You cannot be here tomorrow?
A.     No.
Q.     And for what reason?
A.     I have transportation problems.

Later the trial judge stated:

The Court:     Betty Thomas, who has to take the child to New Orleans to school, I'm
               going to excuse her. The two ladies [Washington and Eanes] that don't
               have a ride, if we have enough after we get through the cause challenges,
               I'm going to excuse them, But I'm not - - if we need them, I'm going to
               leave them on there and I'll just figure out a way to get them a ride.

When the challenges for cause were complete, the trial court stated the following:

The Court:     I'm going to excuse Washington and Eanes because they have no
               transportation.

¶11.    The Ventons provide no case law that prohibits excusing a juror for cause on the basis of a lack

of transportation.   Both Eanes and Washington volunteered to the trial judge that they had transportation

problems.  This trial was not a one-day event, rather it lasted for three days.  What is more, there is no

evidence to show that the Ventons were prejudiced by striking the two women for cause.  This Court has

held that "the selection of jurors is 'a judgment call peculiarly within the province of the circuit judge, and

one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion.'"

*Brown*, 679 So.2d at 771 (quoting *Scott v. Ball*, 595 So.2d 848, 850 (Miss. 1992)).  The Ventons,

however, complain that all four African-American females (i.e., Eanes, Washington, Grigsby, and Williams),

were removed from the venire panel in a suit involving obstetrical treatment of a woman.  There is no

indication that the Ventons were denied a fair, impartial and competent jury of their peers. In *Carr v.*

*State*, 655 So.2d 824, 840 (Miss. 1995), this Court held that "[t]here is no constitutional right to have a

5

jury mirror any particular community." "Proportional representation of the races on a jury is not required." *Harris v. State*, 576 So.2d 1262, 1264 (Miss. 1991) (citing *Booker v. State*, 449 So.2d 209, 215 (Miss.1984)). "What is required is that county officials must see to it that jurors are in fact and in good faith selected without regard to race." *Dorsey v. State*, 243 So.2d 550, 551 (Miss. 1971). *See also Grayson v. State*, 736 So.2d 394, 396 (Miss. Ct. App. 1999). The Ventons are not entitled to a jury that mirrors any particular community, gender, or proportional representation of race. The Ventons are entitled to a fair, impartial, and competent jury. Here, the jury consisted of seven African-Americans and five caucasians which had seven females and five males. Thus, the Ventons had a seated jury with a majority of females and a majority of African-Americans. Accordingly, we find that the trial court did not abuse its discretion in striking Eanes and Washington for cause.

### B. Failure to Disclose Collection Efforts

¶12.    The Ventons argue that the trial court abused its discretion by striking venire persons Grigsby and Williams for stating that they had no problems with medical expenses. The inquiry, according to the Ventons, was too broad and vague. In addition, the Ventons complain that Dr. Beckham did not inform them which venire members were subject to collection efforts by his employer.

¶13.    During voir dire, Dr. Beckham's counsel asked the following question to patients of the clinic employing Dr. Beckham:

> Q.    Anything about the relationship that would impact on your - - let me ask this question once. When we identify y'all that have been patients of these doctors, my question is going to be is there anything about that relationship whether if was how did [sic], the way that doctor treated you, **your bill**, anything of that - - anything of any sort that would cause you difficulty in serving on this case.

(emphasis added). Both Grigsby and Williams stated "no" to the inquiry. The trial judge struck Grigsby for cause because she failed to disclose that there was a problem with the bill, (i.e., it was turned over for

6

collection efforts). The trial judge also struck Williams for the same reason. When the trial judge struck both Grigsby and Williams he stated that he specifically remembered Dr. Beckham's counsel questioning them. However, the trial judge denied Dr. Beckham's request to strike four other venire persons for a failure to disclose the billing situation. The trial judge ruled that Dr. Beckham's counsel had not asked these other four venire persons adequate questions and denied the challenges. In fact, one of the four venire persons sat on the jury and two others were the alternate jurors in this case. Evelyn Smutzer testified before the court concerning accounts receivable documents and gave the names of each venire person that had an account turned over for collection efforts.

¶14. The trial judge did not abuse his discretion in striking Grigsby and Williams. Both women had been former patients at the clinic where Dr. Beckham worked, and both women had problems with the bills and failed to disclose this fact to the trial court. The trial judge specifically remembered that Dr. Beckham's counsel had made adequate inquiry concerning these two women. However, the trial judge denied challenges for cause for other venire persons similarly situated because the judge determined that there was not enough specific inquiry by counsel. We cannot say that the trial judge abused his discretion by striking these women for cause. Accordingly, this issue is without merit.

## II. Whether the trial court erred and abused its discretion for denying the Ventons' Motion to Compel Production of Documents.

¶15. "In regard to matters relating to discovery, the trial court has considerable discretion. The discovery orders of the trial court will not be disturbed unless there has been an abuse of discretion." *Dawkins v. Redd Pest Control Co.*, 607 So.2d 1232, 1234 (Miss. 1992). *See also Mallet v. Carter*, 803 So.2d 504, 506 (Miss. Ct. App. 2002).

7

¶16.    The Ventons argue that the trial court erred by denying them the opportunity to add another expert. The Ventons wanted Dr. Hans Gideon (Dr. Gideon), a document expert from Georgia, to inspect Dr. Beckham's medical records and a "note" written by Terri Hill (Hill), a nurse who participated in Pamela's care. According to the Ventons, they believed that the medical records contained errors.[1] Dr. Gideon was to examine and determine when the notations were made to the documents. In order to perform this examination, Dr. Gideon would need to examine the original documents, not copies, for 10 days in Atlanta. The purpose of Dr. Gideon's testimony was to impeach the testimony of Dr. Beckham and Hill.

¶17.    The Ventons filed suit against Dr. Beckham on May 4, 1998. Dr. Beckham and Hill were deposed in October 1998. During Hill's deposition, it was revealed that she had written a personal note concerning the events of Pamela's case. The note was written after the cesarean section.

¶18.    An Agreed Amended Scheduling Order was enter on November 24, 1998, stating that all discovery shall be completed by April 30, 1999, and all expert witnesses shall be designated no later than March, 17, 1999. In fact, the Ventons designated two experts on November 19, 1998. The Ventons filed a motion for pretrial conference and/or for a trial setting on January 11, 1999. On January 13, 2000, the trial was set for June 26, 2000. On March 8, 2000, the Ventons filed a motion for disclosure of Dr. Beckham's original medical records. A subpoena duces tecum was issued on the same day to Hill for production of her note. Prior to trial on May 3, 2000, the Ventons filed a motion to compel and show cause for the failure to produce the note.

¶19.    Dr. Beckman contended that inspection of his original medical records and a copy of the medical records were provided to the Ventons at his deposition in October 1998. Further, Dr. Beckham filed a

---

[1] The complaint and the amended complaint contained no allegations of inaccurate medical records or a reference to the note.

certificate of compliance with the trial court which stated that he had provided the Ventons a true and correct copy of Hill's note. The trial was continued and rescheduled on May 17, 2000, by an agreed order.

¶20. A hearing was conducted on May 24, 2000. The trial judge denied the Ventons' request on August 31, 2000. In the order the trial judge stated:

> The parties agreed to extend discovery until April 30, 1999, and to designate expert witnesses by March 17, 1999. Depositions of Dr. Beckham and Ms. Hill were taken in October, 1998, at which time the existence of Ms. Hill's personal note came to light. Plaintiffs have had copies of Dr. Beckham's records since July, 1998. Plaintiffs did not request that this Court extend the discovery deadline or the date for the designation of expert witnesses, and they have not shown good cause for the lengthy delay in designating ... Mr. Gideon in May, 2000, more than a year after the expiration of the March 17, 1999, deadline. Plaintiffs previously designated Dr. Fields and Dr. Channell in November, 1998.
>
> This Court orders that plaintiff's Motion for Disclosure of Dr. James Beckham's Original Medical Records and the Motion to Compel/and to Show Cause are not well taken and are both hereby DENIED. Furthermore, defendant's Motion for Protective Order and Motion to Quash are GRANTED. The subpoena issued for Ms. Hill's note shall be quashed, and the requested discovery shall not be had....

¶21. The Ventons argue that the trial court erred when it denied the request to list their expert on August 2000, more than 10 months before the trial finally occurred in June 2001. Further, the Ventons claim that the ruling ignores Rule 4.04 of the Uniform Circuit and County Court and precedent. Rule 4.04(A) pertains to discovery and states:

> All discovery must be completed within ninety days from service of an answer by the applicable defendant. Additional discovery time may be allowed with leave of court upon written motion setting forth good cause for the extension. Absent special circumstances the court will **not** allow testimony at trial of an expert witness who was not designated as an expert witness to all attorneys of record **at least sixty days** before trial.

(emphasis added).

¶22.    Dr. Beckham argues that the Uniform Circuit and County Court Rule 4.04(a) does not take precedence over a scheduling order. He asserts that the Ventons initiated the agreed order with the designated deadlines, counsel for all parties agreed to the order, and no motion for extension of the deadline was made by the Ventons. Further, Dr. Beckham contends that Rule 4.04(A) does not provide for arbitrary designation of expert witnesses 60 days before the trial. The Ventons did not provide any special circumstances in regard to Dr. Gideon's testimony.

¶23.    The first time that Dr. Beckman was aware that the Ventons were even considering Dr. Gideon as an expert was in the motion to compel/motion to show cause and in the Ventons' rebuttal to the defendant's response to motion for disclosure of original medical records on May 3, 2000, less than 60 days before the June 26, 2000, originally scheduled trial date. In addition, Dr. Beckham maintains that the Ventons waited a year and a half after he and Hill were deposed and more than one year after the expiration of the discovery deadline to make new allegations which were never part of the complaint, amended complaint or responses to interrogatories. At the hearing and in his brief, Dr. Beckham argued that the trial was not postponed to 2001 to re-open the discovery process, rather the rescheduling was done because the trial was a third sitting and experts were traveling from out of state. Also, Dr. Beckham argues that the record contains no evidence that the medical records contained any errors, additions or alterations.

¶24.    Each party cites to case law in their briefs that allowed varying times in which to perform discovery. The Ventons cite *Motorola Communications & Electronics, Inc. v. Wilkerson*, 555 So.2d 713,717 (Miss. 1989), a case in which an interrogatory response delivered three days after the discovery deadline and 10 days before trial was considered to be a "seasonable" supplement. The facts of the case sub judice are distinguishable from *Wilkerson*. The discovery period in this case closed more than one

10

and half years before trial and new allegations were made by the Ventons. These allegations were never part of the complaint or amended complaint. Further, the Ventons knew of the note and the medical records in October, 1998, yet offered no reason why there was a delay in implementing research and assistance by an expert document examiner until May 2000. Dr. Beckham relies upon *Mallet*, 803 So.2d at 506, in which an expert witness was not allowed by the trial court. The designation of the witness exceeded the discovery deadline by more than seven months with the only excuse that finding a local expert was more difficult than anticipated.

¶25. A trial court has the authority and indeed a duty to maintain control of the docket and ensure the efficient disposal of court business. *Harris v. Fort Worth Steel & Mach. Co.*, 440 So.2d 294, 296 (Miss.1983). In addition, the trial court has "considerable discretion" in matters pertaining to discovery. *Dawkins*, 607 So.2d at 1234. The standard is an abuse of discretion. *Id*. The trial judge heard arguments by each side, including the requirements of Rule 4.04. The judge concluded that the Ventons were aware of the documents since October 1998. No extension of the deadline for discovery or designation of an expert was requested by the Ventons. Further, the trial judge determined that there was no good cause shown for the delay. This Court finds that the trial court did not abuse its discretion. The trial judge carefully considered the facts of the case and the lack of good cause shown for the lengthy delay in this matter. Accordingly, this issue is without merit.

### III. Whether the verdict was against the overwhelming weight of the evidence.[2]

---

[2] The caption of the Ventons' issue states in part that "the court erred in denying plaintiffs' motion JNOV or for new trial because the jury verdict was against the overwhelming weight of the evidence..." However, the brief addresses only the weight of the evidence, not the sufficiency of the evidence. Accordingly, the weight of the evidence and new trial issue will be solely addressed on appeal.

¶26.    In *Wal-Mart Stores, Inc. v. Johnson*, 807 So.2d 382, 389 (Miss. 2001), this Court stated the

standard of review as follows:

> Where an appellant challenges a jury verdict as being against the overwhelming weight of
> the evidence or the product of bias, prejudice or improper passion, this Court will show
> great deference to the jury verdict by resolving all conflicts in the evidence and every
> permissible inference from the evidence in the appellee's favor. *Bobby Kitchens, Inc.
> v. Mississippi Ins. Guar. Ass'n*, 560 So.2d 129, 131 (Miss.1989). "Only when the
> verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand
> would sanction an unconscionable injustice will this Court disturb it on appeal."
> *Herrington v. Spell*, 692 So.2d 93, 103-04 (Miss.1997).

¶27.    The trial court is given great deference in determining whether a new trial should be granted.

*Odom v. Roberts*, 606 So.2d 114, 118 (Miss. 1992).  "[A] new trial may be granted when the verdict

is against the overwhelming weight of the evidence, or when the jury has been confused by faulty jury

instruction, or when the jury has departed from its oath and its verdict is a result of bias, passion and

prejudice."*Roussel v. Robbins*, 688 So.2d 714, 723-24 (Miss. 1996). "When testimony is contradicted,

this Court will defer to the jury, which determines the weight and worth of testimony and the credibility of

the witness at trial." *Odom*, 606 So.2d at 118. "This Court generally gives great deference to a jury's

findings and will set aside a verdict only when it is contrary to the weight of the evidence and credible

testimony. Moreover, when the evidence is conflicting, we defer to the jury's determination of the credibility

of witnesses and the weight of their testimony."*Ducker v. Moore*, 680 So.2d 808, 811 (Miss. 1996).

¶28.    The Ventons argue that the verdict was against the overwhelming weight of the evidence.  The basis

of the argument is that the jury verdict is unconscionable based on the testimony that the Ventons' and Dr.

Beckham's experts allegedly were in agreement. The Ventons claim that both Dr. Richard Fields and Dr.

Garland Anderson testified that they would have delivered the baby on June 2.  The Ventons maintain that

the jury verdict is unconscionable since Dr. Beckham did not take the actions that the two experts would

12

have taken in treating Pamela. The Ventons are confusing the applicable standard of care with a physician's personal actions. It is true that Dr. Anderson did state on cross-examination that he would have delivered the child on June 2. However, at no time did Dr. Anderson, expert for Dr. Beckham, ever state that Dr. Beckham's actions fell below the applicable standard of care. This case centered on a battle of the experts and discrepancies in when Dr. Beckham suggested delivery of the baby.

¶29.   Dr. Fields, expert for the Ventons, testified that Dr. Beckham did not follow the standard of care. Under the conditions of this case, Dr. Fields testified that Dr. Beckham fell below the standard of care by not recommending a cesarean section on June 2. He stated that the delivery should have been performed on June 2. Further, he opined that the child would have lived if delivered on June 2 or prior to the late afternoon of June 3. Dr. Fields testified that Dr. Anderson agreed with his opinion of the case.

¶30.   On direct examination, Dr. Anderson testified that Dr. Fields's assertion that they were in agreement was not an accurate characterization. Dr. Anderson also disagreed with Dr. Fields's statement that "Dr. Beckham told Mrs. Venton on June 3rd, the afternoon, that it is okay to wait."

¶31.   Pamela had non stress tests performed on May 23, 25, and 28, 1997. All three of the tests had reactive results. Dr. Anderson testified that the standard of care would have allowed 7 days between testing provided the patient's condition remained stable as in Pamela's case. On June 2, 1997, another test was performed with a non-reactive result. Dr. Anderson testified that he did not agree with Dr. Fields's opinion that Pamela required a cesarean section on June 2. At this point, Dr. Anderson stated that the standard of care would require repeat testing within 24 hours.

¶32.   Another test was conducted on the morning of June 3 with a non-reactive result. Pamela returned for a second test in the afternoon of June 3, which also gave a non-reactive result. Dr. Anderson testified that Dr. Beckham was within the standard of care when a second test was performed on June 3rd. He also

stated that Dr. Beckham was also within the standard of care when he recommended a cesarean delivery that day (June 3rd).

¶33.    Dr. Anderson did not believe the baby died due to placental insufficiency.  Dr. Anderson stated that he believed that the baby would have survived if it was delivered on either June 2 or the morning of June 3.  **Regardless of this belief, Dr. Anderson testified that Dr. Beckham did not violate the standard of care.**  Dr. Anderson, continued with the following pertinent testimony concerning the standard of care as follows:

> Q.    Dr. Anderson, do you believe that if Dr. Beckham had performed this cesarean section on Pamela Venton on the morning of June 2 - - excuse me - - the afternoon of June 2nd that this baby would be delivered alive?
> A.    I do.
> Q.    Do you believe that if Dr. Beckham had performed a cesarian section on Mrs. Venton on the morning of June 3 this baby would be born alive?
> A.    I do.
> Q.    Does that mean the Ventons have proven that Dr. Beckham violated the standard of care?
>
> *    *    *    *
>
> **Q.    Does that mean - - the fact that this baby would have been born alive if that section had been done, does that mean that he [Dr. Beckham] violated the standard of care?**
> **A.    No.**
> Q.    Why not?
> A.    Well, there's a certain standard of care that you're held to, and if you hold to - - if you meet that standard of care, not every time will there not be - - that doesn't mean that everything will be alright.  And, as I said before, the obligation - - the minimum obligation once you start [a] nonstress test would have been to have done a test every seven days.  And when Dr. Venton - - I mean Dr. Beckham did the test on the 28th and it was reactive, he wasn't obligated to do another test for seven days.
> Q.    Till June 4th.
> A.    Till June 4th.
> Q.    But he did three.

14

A.      That's correct.  But regardless of what frequency of testing you do, it doesn't mean that every baby will be born alive. What it does mean [is] that there should be very few that will die if you follow the recommendations.

Q.      Good doctor practicing in compliance with the standard of care is still going to lose some babies?

A.      There will be some babies that will not - - there will be some babies that will die even if you follow the standard of care in every aspect.  It should be very rarely, but there will be some that will die.

(emphasis added).

¶34.    On cross-examination, Dr. Anderson did state that if he had a patient in a similar situation he would have recommended delivery of the baby on June 2 or the morning of June 3.  The Ventons complain that the specific questioning by defense counsel was confusing and the facts were not clearly applicable to Pamela's situation. They allege that the question was not carefully crafted and did not include the fact that the baby was positioned in an oblique lie.  They cite an exchange that occurred during Dr. Anderson's direct examination.  However, the Ventons never objected to the questioning during trial and are procedurally barred on appellate review.  What is more, this questioning occurred on direct examination; therefore, the Ventons had an opportunity to clarify any of the defense's questions during their cross-examination. Further, Dr. Anderson reiterated on redirect examination that Dr. Beckham complied with the standard of care by waiting until the afternoon of June 3 to suggest a cesarean section.

¶35.    The Ventons also argue that the jury was confused by Dr. Anderson's testimony that he would have delivered the baby on June 2, but that Dr. Beckham was within the standard of care by suggesting delivery on June 3. The jury returned a 10-2 verdict in favor of Dr. Beckham.  There was no evidence that the jury was confused by the testimony.

¶36.    A jury verdict is given great deference. *Ducker*, 680 So.2d at 811.  A jury verdict will be overturned only when it is contrary to the weight of the evidence and witness credibility. *Id*.  Any conflicts

15

in the evidence are resolved by the jury. *Jackson v. Griffin*, 390 So.2d 287, 289 (Miss. 1980). To the extent that the evidence was conflicting in the case sub judice, the jury resolves all conflicts of evidence. There was a jury question as to whether Dr. Beckham's treatment met the standard of care. Many witnesses testified in this case. Dr. Beckham and three staff members working in 1997, Hill, Rosie Patterson and Tina Jacobs, testified that Dr. Beckham told Pamela to have the cesarean section on June 3, 1997. Pamela stated that she was given an option to have delivery on June 3 or June 4, 1997. Dr. Fields stated that Dr. Beckham fell below the standard of care and that delivery should have occurred on June 2, 1997. Dr. Anderson stated that, although he would have delivered the baby earlier, Dr. Beckham was in compliance with the standard of care. Dr. Anderson never stated that Dr. Beckham fell below the standard of care.

¶37. The jury heard all the evidence and after viewing the credible evidence in the light most favorable to the non-moving party and taking the credible evidence supporting the claims or defenses of the non-moving party as true, we find that the jury decision is supported by the record and is not against the overwhelming weight of the evidence. The jury resolved any conflicts in testimony in favor of Dr. Beckham. Accordingly, the trial judge did not abuse his discretion by denying a new trial. This issue is without merit.

## CONCLUSION

¶38. For these reasons, the judgment entered on the jury verdict of the Circuit Court of Washington County is affirmed.

¶39. **AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB AND CARLSON, JJ., CONCUR. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McRAE, P.J., AND DIAZ, J.**

16

**GRAVES, JUSTICE, DISSENTING:**

¶40.    Unfortunately, in far too many instances, voir dire has become an exercise in finding race neutral reasons to justify racially motivated strikes. Hence, despite the decisions of the U.S. Supreme Court in *Batson* and *Edmonson*, racial stereotyping and racial profiling of jurors persist. Justice Marshall predicted this scenario in his concurring opinion in *Batson* when he wrote, "Merely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." *Batson v. Kentucky*, 476 U.S. 79, 105, 106 S.Ct. 1712, 1727, 90 L.Ed.2d 69 (1986) (Marshall, J. concurring). However, in the instant case, the defendant came armed with his alleged race neutral reasons and therefore failed to ask any specific question of the venire regarding these reasons. Nevertheless, the trial court allowed the defendant to strike, for cause, African-American jurors Shirley Grigsby and Evelyn Williams, for failure to disclose that their medical bills had been turned over for collection. However, the record reveals that they were never asked about their medical bills being turned over for collection. I am compelled to dissent.

¶41.    *Batson* held that "[t]he Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race. *Id.* at 86, 106 S.Ct. at 1717. *Batson* is now applicable to civil cases pursuant to the holding in *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 631, 111 S.Ct. 2077, 2089, 114 L.Ed.2d 660 (1991). The Supreme Court held that " . . . courts must entertain a challenge to a private litigant's racially discriminatory use of peremptory challenges in a civil trial." *Id*. at 630, 111 S.Ct. at 2088.

¶42.    The following must be shown for a party to establish a prima facie case of purposeful discrimination:

1) that he is a member of a cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; (3) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Dedeaux v. J.I. Case Co.*, 611 So.2d 880, 883 (Miss.1992). Upon establishing a prima facie case, the party opponent must give a race neutral reason for striking that potential juror. In doing so, that reason does not have to "rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. However, the reason articulated must also be related to the case. *Id.* at 98, 106 S.Ct at 1724. "The trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. at 1724.

¶43. During voir dire conducted by the defendant, the following question was posed and answered as follows:

> **Q.** Anything about that relationship that would impact on your-- let me ask this question once. When we identify y'all that have been patients of these doctors, my question is going to be is there anything about that relationship whether it was how did, the way that doctor treated you, *your bill*, *anything of that-- anything of any sort that would cause you difficulty in serving on this case*.
>
> Gamble Brothers & Archer Clinic is not a defendant in this case, only Dr. Beckham. So you know, we don't want anybody out there that wants to get back at Dr. Merbitz, or get to Dr. Austin, you know, upset with one of them. That's just not an issue here.
> Ms. Grigsby, anything about your former relationship, if you will, with the clinic that would cause you any difficulty?
>
> **A.** (Shirley Grigsby) No.
>
> **Q.** Were you satisfied with the services that the clinic provided?
>
> **A.** Yes, I was.

* * * *

**Q.** Let's go back here to Ms. Williams. I wasn't -- I'm sorry. Clinic patient. Yes, ma'am?

**A.** (Evelyn Williams) I went to Dr. Austin several years ago. I been to Dr. Curry if I have a urology problem. That's been about '95 since I been there. If I have a problem, I go to Dr. Curry.

**Q.** Anything about your relationship with the clinic that would make it hard for you to be a juror?

**A.** No.

(emphasis added). After the voir dire examination was concluded, the following occurred:

**The Court**:          Any for cause from the defendant?

**Mr. Williams**:          There are, your Honor. Your Honor, the defendant challenges for cause Juror No. 1, Shirley B. Grigsby.

**The Court**:          Is there objection?

**Mr. McTeer**:          Yes, there is.

**The Court**:          State your challenge.

**Mr. Williams**:          Your Honor, we asked Ms. Grigsby questions which elicited answers indicating that she was a former patient of the clinic. Our records-- we have the appropriate person here and available to testify, if the Court wishes to hear testimony, but that Ms. Grigsby's account at one point was turned over to a collection agency by the clinic for nonpayment of that account. I asked her specifically whether there was anything about the relationship with the clinic including the bill -- that was my general question including the bill -- which created any concern. She did not disclose the fact that her bill had been turned over for collection, and that causes us a concern regarding a potential juror -- I think the fact that the patient, either the clinic patient who was turned over for collection , will disqualify her even if she had brought that out. On those two reasons we challenge her. And, as I say, we have the appropriate person here to testify who can verify that she turned over for collection for an unpaid account.

**The Court**:          What does the plaintiff say?

19

**Mr. McTeer**: Your Honor, they knew this. They did not ask her the specific question either privately or otherwise. The witness knew that and she specifically said this was not a problem and would not cause her difficulty in service. At this point in time she's indicated clearly based upon the facts that she can in fact testify. The mere fact that at some point in time she had an account that was in arrears is not a basis for her to be eliminated. For all we know the account has been taken care of, and they all live happily ever after.

**The Court**: Well, for failure to disclose it I'll excuse her for cause.

**Mr. McTeer**: Your Honor, she wasn't asked to disclose it.

**The Court**: She was asked if there was a problem with the bill.

**Mr. McTeer**: There may have been, but she was not asked the specific question as to whether or not that problem had resulted in difficulty for her.

**The Court**: Well, I'll excuse her for cause. All right, are there others?

\* \* \* \*

**Mr. Williams**: Evelyn Williams, and this is the same as before, that Ms. Williams, who has identified relationships with Dr. Curry. She's been a patient of Dr. Beckham [and] Dr. Austin. Her child has been a patient of Dr. Austin. Her account was turned over for collection, your Honor. I asked this lady whether or not there was any problem with her inaction with the clinic including a bill. She failed to disclose the fact that she'd been turned over for collection. This is also the lady who stated that he had been to Mr. McTeer's office -- I think her words were -- for advice.

**The Court**: Is there objection to that?

**Mr. McTeer**: Yes, there is.

**The Court**: All right, I'm going to strike her for cause because I do recall that you specifically questioned her on the failure to disclose it. Are there others.

20

¶44. The defendant also sought to strike jurors James Sanders, Robert Henderson, Louise Wells, and Jeannette Conguista for cause based on their failure to disclose that their clinic accounts had been turned over to a collection agency. However, the trial judge denied the strikes for cause because they were not asked specifically and individually about their accounts. The plaintiffs raised that African-American potential jurors were being struck on this basis and objected several times. Their attorney made the following objections:

> That's another then basis for my objection, your honor, because it was not made clear during the course of any questioning if they were talking about Dr. Beckham or talking about the clinic. I imagine we could go as far to say that any bill to any one of the two would be a basis. First they come in and they claim the fact that Dr. Beckham is a defendant in this case and not the clinic. But now they come forward and they say because these individuals had a bill owed to the clinic, that should be the basis of withdrawal. And I'll point out for the record that the people who seem to be knocked off this jury for this reason are all African-American.

> \* \* \* \*

> But may it please the Court, I'm asking specifically, Judge, that the Gamble Brother Clinic, since they're taking an active role in this, be required to put forth the names of each and every juror on this panel who in fact supposedly did not pay their account on time. Because I want to find out if any white people in this group and that whether or not only blacks are being excluded in this fashion, because so far it is only black people so affected.

> \* \* \* \*

> Objection. Another African-American being striken from this list of supposed accounts with this nonparty to this action. And also, your Honor, we'll point out the fact even though this witness may have been a personal friend, as was Ms. Coleman, as was Mr. - - well, we've already - - we didn't have to deal with the other gentleman - - as was Mr. Coleman, it is clear that he said over and over and over again that he could be fair despite intense questioning from counsel opposite.

¶45. Evelyn Smutzer, the Administrative Secretary for Gamble Brothers & Archer Clinic, was called to testify regarding the accounts of the potential jurors. She testified that she had a list of fifteen potential jurors whose accounts had been turned over to collections.

¶46.    Here, the question posed by the defense was very general and too broad to strike any juror for cause.  In fact, the defendant is being rewarded for questions which he did not ask.

In *Mack v. State*, 650 So.2d 1289, 1298 (Miss. 1994), a potential black male juror was struck for failure to be employed, while the State accepted a white female juror who was also unemployed.  The prosecutor failed to voir dire on the status of his employment. The court held that "nothing about the facts of this case suggests that a juror's employment status should be an issue."*Id.* This Court held that the failure to voir dire weighed against the State.  *Id.*  "The failure to *voir dire* usually comes in to play when the prosecutor expresses some suspicion or uncertainty about the true situation involving the juror, such as when he "believes" that the juror is related to a criminal, or has been involved in some activities which might engender a negative attitude toward the defendant. This factor is closely related to the lack of an evidentiary basis." *Id.*  The defendant could simply have posed a direct, pointed or specific question to jurors Grigsby or Williams about their accounts being turned over to collections.  Clearly, he came armed with a list of delinquent accounts and a witness to testify in support thereof.  All of which, he never bothered to disclose to plaintiff, to the appropriate juror during voir dire or to anyone else prior to his motion to strike those jurors for cause.  Armed with an arsenal of documentary evidence and witness testimony, he failed to give the veniremen an opportunity to confirm or deny his allegations that they were biased.

¶47.    In *Mack*, a juror was struck for having written bad checks.  The appellant argued that the prosecutor violated Uniform Circuit Court Criminal Rule 4.06 by failing to disclose that information prior to voir dire. *Id*. at 1299. We held that failing to give a party opponent information on prospective jurors was not a violation of Rule 4.06  *Id.*   However, this Court also held that an attorney may not, "with impunity, withhold information concerning a prospective juror which impacts upon the juror's ability to be fair and impartial." *Id.*  We did not extend Rule 4.06 because there was no claim of a failure to disclose

22

information impacting upon a juror's ability to be fair and impartial. *See Id.* In the instant case, we have such a claim.

¶48. Here, the defendant should have disclosed the information regarding the accounts at least by way of voir dire examination. The defendant should not be rewarded for such conduct. If he had concerns about tainting the entire venire then he could have asked for the opportunity for individual voir dire of the jurors regarding these accounts. Every single strike for cause which was sought by the defendant based on his claim of delinquent accounts was directed at an African-American juror.

¶49. The matter of the delinquent accounts was clearly a pretext which allowed for the systematic exclusion of African-Americans from the jury. Those jurors were excluded for failure to disclose a matter about which they were not asked. That is unfair, unjust and improper. Recognizing the impropriety of racial bias in the courtroom, we hold the race-based exclusion violates the equal protection rights of the challenged jurors. *Edmonson*, 500 U.S. at 616, 111 S.Ct. at 2080.

¶50. It is fundamentally unfair in our system of jurisprudence for a party to unilaterally obtain privileged information about members of a jury pool and then, without revealing it to the other side prior to voir dire and without making any inquiry during voir dire, subsequently use that information to justify a strike against a potential juror. This method deprives the opponent of any opportunity to check the veracity, accuracy or truth of the information which is being used as a basis to justify a challenge.

**McRAE, P.J., AND DIAZ, J., JOIN THIS OPINION.**